**BELLE SPRINGS CREAMERY CO. et al.**
**v. SCHULTZ et al.**
**No. 11440.**

Court of Civil Appeals of Texas. Dallas.
March 10, 1934.

Ben F. Napheys, Jr., of Abilene, Kan., and Butts & Wright, of Cisco, for appellants.

McCormick, Bromberg, Leftwich & Carrington, of Dallas, for appellees.

BOND, Justice.

H. M. Schultz instituted this suit against the Belle Springs Creamery Company, a corporation of Abilene, Kan., to recover damages arising out of a purchase of eggs, and to effect collection sued out a writ of garnishment, directed to the First National Bank of Dallas, to impound funds in its possession. By its answer to the writ, the garnishee vouched in the suit the Citizens' Bank of Abilene, Kan., as claimant to the funds. The Kansas Bank answered, claiming the funds impounded. For convenience, H. M. Schultz will be referred to as plaintiff, the Belle Springs Creamery Company as defendant, the First National Bank of Dallas as Dallas Bank, and the Citizens' Bank of Abilene, Kan., as Kansas Bank.

The record reveals that, on March 26, 1931, defendant sold to plaintiff 400 cases of eggs, for which plaintiff agreed to pay $2,400. The introduction of the contracting parties was brought about through W. W. Butler, an independent broker. Their contractual relationship, however, is based on written instruments; defendant mailing to plaintiff an invoice of the eggs it had for sale, an inspection certificate describing the eggs and a warehouse warrant, or certificate, embodying the terms and conditions of storage, and, in turn, plaintiff mailing to defendant a check for $400, with a note for $2,000, in payment thereof. There is no further evidence of the contract between the parties.

The invoice recites the sale of 400 cases slack-packed eggs, the terms and conditions for payment, and stipulates that the seller should pay the storage and insurance; the inspection certificate describes the eggs sold, as being of "good quality, medium to large size, mixed color, sweet odor and graded slack storage," and states that some of the eggs were "dirty, stained, small, seconds and checks"; and the warehouse warrant, or certificate, specified that the eggs were received in the seller's cold-storage building in Abilene, Kan., for storage to December 31, 1931, subject to the buyer's order, on payment of $2,000, the seller to carry insurance in the sum of $2,250, and that the conditions of such storage are that: (1) "All loss or damage to property occasioned by fire, water, leakage or rottage is at owner's risk and this company is not responsible for shrinkage in weight." (2) "All property is stored at owner's risk, condition and quality unknown." And (3) "no delivery of goods specified upon the reverse side of this warrant will be made unless order is accompanied by this warehouse receipt." On these proposals and conditions rests defendant's covenants, and in accordance therewith plaintiff paid the $400 cash and delivered to defendant his promissory note for $2,000, payable "on demand," and bearing interest from date of the purchase until paid.

On September 26, 1931, on demand, plaintiff paid on said note $200 with interest, as a margin for the decline in the egg market, and delivered to defendant an $1,800 renewal note for the balance due; this note was made payable "on demand," to bear interest from date thereof, and to further provide that the eggs were pledged and delivered to defendant as collateral security for the payment of said note, and to contain accelerated clauses, effecting the maturity of the note in case of insecurity or loss of the eggs pledged, authorizing a sale by the pledgee, in the event of a decline in value, or failure of the pledgor to pay margin on such decline, and to evidence ownership of the eggs to be in plaintiff, subject to defendant's lien.

On December 10, 1931, plaintiff ordered the eggs shipped, and defendant delivered them to the railroad company at Abilene, Kan., for transportation to Dallas, Tex., receiving therefor a bill of lading. Defendant attached the bill of lading to a draft drawn on plaintiff, for the sum of $2,052.85, which amount included the principal of the $1,800 note, $24.37 interest, $220.48 freight, and $8 for two tons of ice, used in the freight car containing the eggs. On arrival of the eggs at Dallas, December 12, 1931, plaintiff paid the draft, inspected the eggs, and found a material deterioration in quality, affecting their value; that they were mouldy, "whiskered," spoiled; that water had accumulated in the cases about the eggs; and that they were neither sweet-odored nor sweet-tasting, and some testimony is to the effect that such condition was due to "improper storage."

The eggs were candled, sorted, graded, and sold by plaintiff on the Dallas market, considering only plaintiff's proof, at a considerable reduction from a reasonable market value of the eggs; had they arrived in Dallas in first-class condition, such market value would

have been from $8 to $8.50 per case, where the maximum salvage value of the eggs, upon their arrival at Dallas, was $4.57 per case, plaintiff realizing only $1,700 from the entire shipment.

Subsequent to the arrival of plaintiff's shipment, the A. Rubenstein Produce Company also purchased from the Belle Springs Creamery Company a similar shipment, subject to inspection at Dallas. The bill of lading attached to draft on the Rubenstein Company for $2,055.13, payable to the Citizens' Bank of Abilene, Kan.; the draft was deposited by the Kansas Bank to the credit of the drawer, the Belle Springs Creamery Company, subject to the depositor's check, and in turn the Kansas Bank forwarded the draft and bill of lading through the usual banking channels, to the First National Bank of Dallas, for collection. On an inspection of the shipment, the purchaser declined to accept, until the seller reduced the amount of the draft, and, in accordance therewith, the Kansas Bank authorized the Dallas Bank to reduce the draft by $300. The modified draft was paid and, before a remittitur of the proceeds could be made by the Dallas Bank to the Kansas Bank, the writ of garnishment was served on the collecting bank.

On trial before the court, without the intervention of a jury, judgment for $1,100 was rendered for plaintiff (Schultz) against defendant (Creamery Company), and for plaintiff against intervener (Kansas Bank), and the garnishee (Dallas Bank), for the amount of the judgment thus rendered against defendant, allowing the garnishee $150 as attorney's fee for making its answer in the garnishment suit, payable out of the impounded funds.

In disposing of this appeal, we will consider first the garnishment phase of the suit, and in this we are led by the authorities of this and other jurisdictions to follow the rule of law that the rights, obligations, and interpretation of contracts are determinable by the law of the state where the contract was made, unless a different forum is shown to have been intended to be the place of performance. The draft was deposited by defendant (Creamery Company) with the Kansas Bank, subject to defendant's check; thus, in our opinion, the rights of defendant and the Kansas Bank are settled by the laws of that state. In the case of Burdg v. Scott, 111 Kan. 610, 203 P. 668, the question there centered around the ownership of property, represented by bills of lading attached to drafts, deposited in a bank, for which the depositor received credit on the bank's books, subject to check. In passing on the ownership of the property, the court stated, in effect that, after the drafts were taken by the bank as a deposit and placed to the credit of Scott (the depositor), the wheat became its property, citing as thoroughly settling the question the decisions in Scott v. W. H. McIntyre Co., 93 Kan. 508, 144 P. 1002, L. R. A. 1915D, 139; Farmers' & Merchants' Nat. Bank v. Sprout, 104 Kan. 348, 179 P. 301; Ranney-Davis Mercantile Co. v. Home Nat. Bank, 105 Kan. 474, 185 P. 287; Lampl v. Hawkins, 106 Kan. 423, 188 P. 233; Fourth Nat. Bank v. Bragg, 127 Va. 47, 102 S. E. 649, 11 A. L. R. 1034, and 11 A. L. R. 1061, note. Thus, it will be seen that the facts in this case follow closely the Kansas rule and manifestly the cited decisions settle the rights of the intervening Kansas Bank, as to the title to the draft and the proceeds thereof, as passing incidentally with the deposit.

Aside from the above rule, and considering the Texas decisions, in the case of Heid Bros. v. Commercial National Bank, 240 S. W. 908, 912, 24 A. L. R. 904, a decision of the Commission of Appeals, approved by our Supreme Court, held in a situation as here that if "the bank was owner of the drafts by virtue of having credited, finally and in good faith, the account of Pierson-Lathrop Grain Company with the amount of the drafts, of course plaintiff could not take the proceeds under garnishment." To the same effect is the holding in Provident National Bank of Waco v. Cairo Flour Co. (Tex. Civ. App.) 226 S. W. 499, 503, citing, with approval, the text in 7 C. J. 635, to wit: "Where checks or drafts are indorsed [and deposited] and are accepted as cash they become the property of the bank, and the bank becomes the debtor of the depositor in the amount of such check, even though it is understood that the bank has the right to charge back the amount if the paper deposited proves uncollectable. So where a bank accepts for deposit a check drawn on itself and credits the payee with the amount, this creates the relation of debtor and creditor between the bank and the payee and is equivalent to a payment of the amount of the check to the drawer; and it is held that, under such circumstances, the bank has no right to charge back the amount credited to the payee, even though the drawer fails to pay the amount." The quoted text is also supported by Blaisdell, Jr., Co. v. Citizens' National Bank, 96 Tex. 626, 75 S. W. 292, 295, 62 L. R. A. 968, 97 Am. St. Rep. 944; Chrisman v. Lumberman's Nat. Bank (Tex. Civ. App.) 163 S. W.

651; Howe Grain & Mercantile Co. v. A. B. Crouch Grain Co. (Tex. Civ. App.) 211 S. W. 946; Kadane & Co. v. Security National Bank (Tex. Civ. App.) 219 S. W. 506.

The record reveals that there is no conflicting testimony disclosing that the intervening Kansas Bank was not the debtor of the depositor; manifestly, the draft belongs to the intervener, and the proceeds are not subject to the garnishment writ; therefore, we hold that the court erred in its finding that the funds belonged to the defendant, and in decreeing judgments against the funds.

■ In the main suit, the issues center around the question whether the agreement of the parties, at the time of delivery of the eggs to the warehouse and common carrier, was an executed or executory contract, i. e., whether the fee in the eggs placed in storage was complete in plaintiff at the time of the passing of the consideration and the storage of the eggs, and thereafter the delivery to the railroad company. An executed contract consists in the performance of everything necessary to be done, according to the terms of the contract, by the parties contracting, so as to fully invest the parties contracting with dominion over the thing parted with. The defendant, at different stages in the transaction, was both a seller and warehouseman. As seller, defendant (Creamery Company) lost dominion over the eggs, parted with the title, and occupied the position of a creditor, with the property pledged as security; as warehouseman, it was a bailee under specific storage covenants, holding the property subject to the order of the bailor, on payment of his obligations; on the other hand, plaintiff performed the covenants of sale, pledged the eggs as security, and bailed them subject to the conditions of the warehouseman's receipt. We are of the opinion that plaintiff's title vested at the time he accepted the conditions of bailment, and effected the consideration in the payment of the $400 and the execution and delivery of the $2,000 note. He became a debtor and pledgor of defendant as the seller, and bailor of defendant as a warehouseman; his dominion over the shipment was complete, subject only to the payment of his note and the lifting of the pledgee's lien. We feel that there was no obligation incumbent upon the seller to deliver the eggs to plaintiff at any particular time, but defendant was obligated to deliver only on plaintiff's order. Plaintiff was the directing agent of defendant; thus, the delivery to the railroad company was, in effect, a delivery to plaintiff, the railroad company becoming his agent in the transportation.

This conclusion is accentuated by plaintiff paying the freight charges and for the icing of the refrigerator car in transit; manifestly, plaintiff would have sustained the loss, if the eggs had been destroyed while in the warehouse or in transit. And, further, plaintiff's obligation to pay the note on demand was not contingent upon proper storage or safe delivery, and the accelerated clause of the note refuted the idea of an executory contract. The fact that defendant adopted the method of collection of the note through draft with bill of lading attached, does not, in our opinion, change the relative position of the contracting parties. Such method, evidently, was subsequent to, outside, and independent of the contractual relationship and cannot be construed as affecting the contract so as to require defendant to deliver the eggs in Dallas. Therefore, we hold that title to and legal possession of the eggs passed in the state of Kansas; that the extent of deterioration and the measure of damage is cast at the place of delivery to the common carrier.

■ It is evident from the record that the judgment of the lower court is based upon the condition of the eggs on their arrival at Dallas, and the measure of damage determined by the Dallas market. The record is silent as to the condition of the eggs and the difference in market value, as contracted for and as delivered at Abilene, Kan. If the eggs had been damaged by reason of any negligence of defendant, then, in our opinion, the difference between the market value of the eggs, in the condition that they should have been in and the condition they were actually in at the time and place of delivery, would have been the measure of damages; or, if there was no market for the eggs, then the difference in the actual value of the eggs, in the condition that they would have been in and the condition that they were actually in would have controlled. Thus, the judgment finds no support in the testimony.

■ Furthermore, it is seen that the storage certificate excludes all loss or damage to the property, occasioned by fire, water, leakage, or rottage, and that the storage, at the time specified, was at the owner's risk. These contentions exclude the idea of responsibility for damage arising by reason of causes specified, in the absence of proof of actual negligence. There is no evidence that defendant had negligently permitted the eggs to become

water-soaked, or had kept them at an improper temperature, or that it had in any manner failed to perform its duties as a warehouseman. The only testimony bearing upon the issue of negligence is a related conclusion of witnesses that the damaged condition of the eggs was due to improper storage. It is well known that some goods deteriorate or decay through operation of inherent or natural causes, and it cannot be reasonably supposed that eggs, normally sweet-odored and sweet-tasting when fresh, even under the most favorable circumstances, would retain their qualities entirely in cold storage for a period of nine months. Contrary to the general rule that a presumption of negligence arises when property is delivered in good condition and returned in an injured condition, is in chattels which deteriorate or decay through natural and inherent causes. The record reflects a sale of fresh eggs and a delivery of cold-storage variety, accompanied with their natural and inherent deterioration; to what extent the natural and inherent condition bears to the whole of the damaged condition the record does not disclose. The burden was upon plaintiff to show the extent of such natural and inherent deterioration. Manifestly, the full extent of injury to the eggs was not and could not have been caused by the failure of the bailee in the exercise of ordinary care, incumbent upon warehousemen. Thus, defendant, as a warehouseman, under the facts stated, was duty bound to deliver to plaintiff's agent, the common carrier, eggs as good as shown by its warehouse certificate, less their "natural and inherent" deterioration. The presumption of negligence will not be imputed where the deterioration shown is due to the natural and inherent deterioration of the product. In the case of Southern Ice & Utilities Co. v. Stewart, 15 S.W.(2d) 132, 136, Justice Levy, for the Texarkana Court of Civil Appeals, held: "It is true that although the eggs were delivered in fresh condition to appellant, the mere fact, standing alone, that they were redelivered to appellee in inferior condition, would not justify the presumption of negligence on the part of appellant. That rules does not apply to chattels which deteriorate or decay through operation of inherent or natural causes. Patterson v. Wenatchee Canning Co., 53 Wash. 155, 101 P. 721. Eggs are, as admittedly appears, inherently of a delicate and perishable nature. They are liable to decay and do not long stand up under ordinary circumstances. The yolks normally turn dark and the whites become thin and watery."

In our opinion, the rule announced finds application only to the condition of the eggs attributable to their natural and inherent nature and not to abnormal conditions. Their abnormality brings into play the general rule of presumptive negligence; yet the fact that the eggs were delivered by the common carrier to plaintiff at Dallas in an abnormal condition does not carry with it the presumption that they were delivered to the carrier in the same condition, but if any presumption is indulged in, then the presumption of negligence may just as reasonably be applied to the railroad company, in that they were delivered in normal condition and damaged in transit, as to presume the negligence was due to causal acts of defendant.

We are of opinion that the evidence does not warrant a finding that the eggs were in an abnormal condition when delivered to the carrier, or that the defendant was guilty of negligence which proximately caused or contributed to cause the injury to the eggs, and, further, the measure of damage is not shown at the time and place of delivery. We therefore conclude that the judgment of the lower court should be reversed, that the judgment in favor of the plaintiff against defendant should be remanded, and as against the intervener, Kansas Bank, and the garnishee, Dallas Bank, should be here rendered in favor of the Kansas Bank for the funds impounded by the writ of garnishment, and in favor of the garnishee against plaintiff for the attorney's fee of $150, for making answer in the garnishment proceedings, and it is so ordered.