## CITY OF DALLAS v. MILUM et al.

No. 13753.

Court of Civil Appeals of Texas. Dallas.
Jan. 17, 1947.

Rehearing Denied April 4, 1947.

H. P. Kucera, City Atty., A. J. Thuss, Jr., Guy L. Nevill and W. K. Chapman, Asst. City Attys., all of Dallas, for appellant.

Cedric G. Hamlin, Franklin E. Spafford and Robertson, Leachman, Payne, Gardere & Lancaster, all of Dallas, for appellees.

BOND, Chief Justice.

This suit was filed by appellant City of Dallas (plaintiff) against appellee Phil J. Milum d/b/a The Dallas Bonded Warehouse (defendant), vouching in Associated Indemnity Corporation, his indemnity insurer, for damages to 500 cases of eggs. The suit is based on breach of contract and, in the alternative, on negligence of appellee as a public warehouseman.

Plaintiff alleges, in effect, that on or about March 6, 1944, for and in consideration of 14 cents per case for the initial month and 10 cents a month thereafter, the defendant contracted and agreed to store 500 cases of eggs in his public cold storage warehouse; to keep and care for said eggs in the usual and customary manner of storage in such places; to deliver the eggs at such times as the City should call for same; that the eggs were delivered in good merchantable Grade A condition suitable for human consumption; but, in August following, the eggs tendered to plaintiff were rotten, deteriorated and unfit for human consumption, due to defendant's breach of contract to properly care for said eggs as was his duty as a public warehouseman in the interest of the public and especially of plaintiff. And, in the alternative, plaintiff alleged negligence on part of defendant in the following particulars: (1) For failure of proper refrigeration, permitting the temperature in the cooling vault where the eggs were stored to rise to such a degree that the eggs became spoiled and unfit for human consumption; (2) for failure to ascertain the rise in temperature in time for defendant to remove the eggs from the storage room to another room or place adequately cooled and refrigerated; (3) for failure to advise plaintiff of the rise in temperature until after the eggs had become spoiled and unfit for human consumption, to enable plaintiff to remove the eggs; (4) for failure of defendant to remove the eggs to prevent them from spoiling and becoming unfit for human consumption; (5) for failure of defendant to turn the crates periodically while in storage to prevent the eggs from deteriorating and becoming unfit for human consumption; (6) for failure of defendant to properly stack the crates on the floor of the cooling room as to allow air to circulate through and around the crates, and for allowing water to accumulate on the floor and about the crates; (7) for defendant's active negligence in storing potatoes, tomatoes and grapefruit in the same cooling vault where plaintiff's eggs were stored.

The defendant answered by general denial and specially pleaded that at the time the eggs were withdrawn from storage, their condition was not due to any breach of contract or negligence of defendant, but was solely caused as the result of natural deterioration; especially so, because the eggs were "weak" and had begun to deteriorate before they were placed in storage; that eggs are of that particular nature as to rapidly deteriorate in quality through operation of natural causes in cold storage, and that the defendant advised the City official having charge of the eggs that their condition was such that he had no storage space available in his cooling vaults to adequately keep such eggs for any great length of time. That, with that understanding, he accepted the storage of the eggs for only 30 to 60 days and no longer. Defendant further pleaded that, the deterioration of the eggs having already commenced at the time they were received, because of lack of proper care before reaching his warehouse, he was unable to prevent their further deterioration; that under the circumstances his cooling vaults were not adequately designed or intended for the stor-

age of eggs for a long period of time, and that he so advised said agent at the end of the 60 days and several times thereafter of the condition, and repeatedly requested their removal, but that said agent failed and refused to remove the eggs from storage; hence, as a result, the inferior quality and condition of the eggs at the time they were withdrawn by plaintiff was not due to fault on the part of defendant, but was due solely to natural deterioration and plaintiff's breach of contract in failing to remove same.

On trial to a jury, at the conclusion of plaintiff's testimony and on motion of the defendant, the trial court discharged the jury and rendered judgment for the defendant.

■■ The record discloses that defendant operates a public cold storage warehouse under the statutes of the State. Title 93, ch. 2, art. 5568 et seq. and ch. 4, art. 5612 et seq., R.C.S. Vernon's Ann.Civ.St. arts. 5568 et seq., 5612 et seq. And, as such warehouseman, in absence of contract limiting his liability, he was obligated to perform faithfully the duties of a public warehouseman, which included the duty to properly exercise that degree of care in the safekeeping of goods entrusted to him which a reasonably careful man would exercise in regard to similar goods of his own. On March 6, 1944, plaintiff, acting by and through its duly authorized City Purchasing Agent, delivered to defendant 500 cases of eggs. Defendant accepted the eggs on the basis of the storage fee and thereafter rendered account therefor to the City and was paid the storage fees for the time the number of crates were in storage—from March 6 to August 15, 1944. Plaintiff's evidence admits that there were some withdrawals, but without the City records being available at the trial, the exact number of crates left with defendant after such withdrawals, and the exact amount of the City voucher given to defendant in payment for such storage were not disclosed. However, there is evidence to the effect that there were in storage during the time the eggs were placed with defendant until they were withdrawn, 500 cases. Hence the amount of the voucher is only a matter of mathe-

matical calculation, and, at least, there is evidence that plaintiff suffered damage to the amount of 300 cases. The record further discloses that defendant knew that the City of Dallas had acquired the eggs as active distributing agent for the Federal Government for surplus commodities accumulated during the war, to be used for hospitals and needed charity purposes, and that the eggs were to be released to the City hospitals as demanded. Manifestly, the City was the special owner of the eggs for the purpose of carrying out such distribution; hence authorized to place them in storage and sue for their damage. It is further in evidence that at the time the eggs were received by the City, 100 cases were delivered to Parkland Hospital, a recognized charity institution of the City and County of Dallas; and 500 cases were delivered to defendant's warehouse for the account of the hospital.

■ In view of the action of the trial court in withdrawing the case from the jury and rendering judgment for the defendant at conclusion of plaintiff's testimony, we deem it necessary only to relate testimony as relates to plaintiff's cause of action or which, by reasonable deduction or inference, presents issues raised by plaintiff's pleadings. Aside from the uncontroverted testimony as related above, the evidence shows that 100 cases of the eggs, taken from the gross shipment of 600 cases, were good wholesome Grade A eggs, and the eggs withdrawn from storage in March and April thereafter were also of that grade, and we think a reasonable inference could be drawn that the eggs when placed in storage were of the same grade, that is, good wholesome Grade A eggs. In August the remaining eggs in storage were found to be deteriorated to such a degree as to be unfit for human consumption. Thus it may well be presumed that such deterioration, less natural deterioration, occurred while in storage; and, in absence of proof on the part of defendant, such deterioration was the result of some want of ordinary care on the part of the warehouseman. There is further evidence in the record that when the eggs were inspected in August, the paper crates were wet and damp; so much so as to

cause the crates to fall apart; that the crates were stacked in tiers of 15 or 16 crates high and more or less placed together, one stacked upon and against the other; that the crates were not turned any time during storage; and that tomatoes and other perishable goods were stored in the same vault with the eggs. There is also in evidence that the failure to turn crates of eggs in storage at various intervals; failure to stack crates in such a way that air will circulate about them; and the storing of other perishable products in the same room with eggs, would cause deterioration. There is expert testimony in evidence that if Grade A eggs are placed in storage and properly handled, the natural deterioration would be only about 10 percent of their value from March running to August, approximately six months, or would be worth $9 per case. We think, as a whole, the testimony of plaintiff raised the issues as pleaded, and should have been accorded a jury determination.

It is a sound rule of law that every reasonable inference of fact supported by the statement of facts must be drawn in favor of the losing party where the trial court withdraws the case from the jury and renders judgment. Therefore, if there is any evidence in the record on any theory raised by pleadings, it is the duty of the court to submit the issue. The delivery of property to a warehouseman for storage and the failure of such warehouseman to return the property, or if the property is returned in a damaged condition, the burden rests upon the warehouseman to show that the damage resulted without fault or negligence on his part. In absence of proof to the contrary, the presumption of negligence prevails in such cases. So, in the case at bar, 500 cases of eggs admittedly having been delivered to defendant under contract for storage, the jury could have reasonably found that at time the eggs were put in storage they were good Grade A eggs fit for human consumption; that at the time they were withdrawn, had they been properly handled, would have been reasonably worth $9 per crate. Under such showing, the jury could well have found that the defendant was guilty of breach of contract or negligence in the particulars alleged by the plaintiff and that such breach or negligence resulted in the damages plaintiff sustained. On the other hand, the defendant relates facts and circumstances from which the jury might well have acquitted him of any such breach or negligence in the storage or handling of the eggs. But, the defendant having been offered as a witness by the plaintiff, he being an interested witness, and the defendant having failed to offer any testimony in defense, plaintiff was not foreclosed by his adverse testimony and the jury not bound to have accepted same as true. At most, the testimony raises issues for the determination of the jury.

The case not having been fully developed, and without comment on the weight of the testimony, the judgment of the court below is reversed and the cause remanded for a new trial.

LOONEY, J., concurs.

### On Rehearing.

We feel warranted in presenting further our convictions that this cause should be reversed and remanded in view of appellees' motion for rehearing.

Bearing in mind that this is an appeal from the action of the trial court in discharging the jury and rendering judgment in favor of the defendants at the close of plaintiff's testimony, the evidence in favor of plaintiff must be given full credence, excluding all adverse testimony or inference in derogation thereto, in support of plaintiff's cause of action. The plaintiff City of Dallas brought this suit to recover damages on account of material deterioration in the quality and value of 334 cases of eggs, occurring from the date defendant Milum accepted the eggs, March 5, 1944, until plaintiff, on August 15, 1944, removed the eggs from storage, as the result of the failure of the defendant warehouseman to exercise such care in regard to same as a reasonably careful owner of similar goods would exercise. Chapter 2 of Title 93, art. 5568 et seq.; Chapter 4, Title 93, art. 5612 et seq., Vernon's Ann. Civ.St. arts. 5568 et seq., 5612 et seq.

Plaintiff alleged that on March 5, 1944, the defendant Dallas Bonded Warehouse,

owned and operated by Phil J. Milum, was a public warehouse chartered under and by virtue of the above cited statutes, and was exercising the privileges granted, and assuming the obligations as therein provided; and further plaintiff specially alleged that said defendant warehouseman contracted and agreed to keep and care for plaintiff's eggs in the usual and customary manner of storage in such warehouses, and to deliver the eggs at such times as the City should call for them; that said defendant agreed to inspect said eggs which they received for storage and to notify plaintiff in the event the same were not kept in good condition, and to turn the eggs periodically while in storage; that the said defendant failed to inspect plaintiff's eggs when he accepted same and, in any event, failed to give plaintiff any notice whatsoever as to the condition of plaintiff's eggs, failed to turn the eggs and in the exercise of his duty as a public warehouseman, breached his contract to properly care for said eggs. And, in the alternative, plaintiff repeating in detail the statutory obligations and responsibilities that the defendant Milum had assumed under the law, supra, and breached the terms of his duty therein provided; and, in addition thereto, plaintiff alleged that said defendant failed in the particulars enumerated in our original opinion. The defendants severally answered by general denial and specially pleaded that the condition of the eggs at the time of their withdrawal was not due to any negligence or breach of contract on the part of the defendant warehouseman, but such deterioration was the natural result to such eggs in storage, and especially so when stored for such long period of time; that the eggs stored were of that particular class of eggs, such as rapidly deteriorate in quality through operation of natural causes.

The evidence discloses that on March 5, 1944, Mr. Dysart, purchasing agent for the plaintiff City of Dallas, delivered 500 cases of "Grade A Eggs" to defendant's warehouse plant in the City of Dallas and they were placed in cold storge by the defendant Milum; that in April, following, the plaintiff made withdrawals from the number of cases on deposit, and the eggs were then found to be in quality of Grade A eggs, the same as when first delivered to said cold storage plant; and that on August 15, 1944, the remaining eggs were found to be deteriorated and rotten, wholly unfit for human consumption. There is further testimony in the record that the natural deterioration of eggs such as were delivered by plaintiff to the defendant Milum for storage, from date of delivery to date of withdrawals, about six months, would be about 10 percent; and that the reasonable market value of such eggs when delivered to the warehouse was $9.90 per case; and, *"if such eggs had been handled and kept with ordinary care by the defendant Milum in his warehouse, less deterioration, would be approximately $9.00 per case."*

Evidencing the facts, supra, a Mr. Herndon, after qualifying as an expert egg and poultry dealer for 30 years, in response to questions, testified:

"Q. Are you familiar with the market price of eggs in Dallas Texas * * * in 1944? A. Yes * * *.

"Q. I will ask you if you know the length of time that eggs are ordinarily left in storage? A. Six or eight months, before much deterioration; they begin to deteriorate after six months if they are not processed out, and those were not.

"Q. I will ask you to state whether the six or eight months period would present anything different except the natural deterioration? A. I would say after the end of six months, probably eight months, 10 percent.

"Q. *I will ask you whether or not there* is any difference in the market value between eggs such as are set out here and eggs that may only be used, a certain percent for canning purposes? A. Yes, there may be some difference in the market value * * *.

"Q. Mr. Herndon, assuming that 600 cases of eggs as set out by the grading certificates which were handed to you yesterday (Grade A eggs) arrived in Dallas, Texas, on or about March 6, 1944; that 100 cases of eggs were withdrawn from the car and found to be in good condition and fit for human consumption, which was the

market value of eggs in Dallas, Texas, March 6, 1944 * * * In connection with your answer, Mr. Herndon, you will take into consideration the natural deterioration of the eggs for this period of time * * * State your answer. A. In March we had $9.00 a case for eggs in Dallas County, Texas * * *

"Q. Assuming that the other 500 cases of eggs that were placed in storage—assume they were placed in storage, I will ask you the market value of eggs in Dallas, Texas, on August 15, 1944, *if such eggs had been handled and kept with ordinary care by the defendant Milum in his warehouse, subject to natural deterioration?* (Italics added.) A. We were paying $9.-90.

"Q. Are you taking out natural deterioration? A. No, sir, that's our buying price here.

"Q. Less natural deterioration, what was the price, what would it be? A. From March to August I think 10 percent, about six months approximately.

"Q. Less 10 percent? A. Yes * * * approximately $9.00."

Mr. Dysart, after relating that he delivered to said defendant for storage 500 cases of eggs and in April 1944 made withdrawals therefrom, testified in answer to questions:

"Q. I will ask you if you know the amount of money which was paid to Mr. Milum for the storage of these eggs after August 15, 1944? A. $146.30, according to the records of our City.

"Mr. Akin: We object, the records would be the best evidence.

"The Court: Do you know that yourself? The Witness: Yes.

"The Court: Did you issue the check? The Witness: No, sir, I took the auditor's records.

"The Court: The objection is sustained, the records would be the best evidence.

"Mr. Chapman: The plaintiff excepts.

"The Court: Do you know independent of the record? The Witness: No, only that we had something over 300 cases in there and were paying at the rate of 10 cents per case. Of course some were being withdrawn, just how many we were paying on at that time, I don't know.

"The Court: The objection is sustained.

"Mr. Chapman: The plaintiff excepts."

It may be said, although immaterial on this appeal, that the action of the court in sustaining the objection of the defendant leveled at the testimony of Mr. Dysart in reference to the check, was not error; but it will be seen that there was no motion made to expunge the testimony from the record, or consideration of the jury, and that no objection was made to Mr. Dysart's testimony that the City *"had something over 300 cases"* in storage with said defendant, on which the City was paying storage at the rate of 10 cents per case. The rule of practice in this state is that it was incumbent upon the defendants after the testimony was elicited and before the jury, to move the court to instruct the jury to disregard such testimony; hence, no motion having been made, the testimony, notwithstanding the objection, established the facts related as effectively as such would have been otherwise established.

R.S. art. 5632 declares that "A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care." This statute is declaratory of the common law rule. Under this rule, liability for the loss of or damage to goods stored for hire, is that of a bailee for the mutual benefit of bailor and bailee, and depends upon prudence, diligence and good faith in the safe storage of goods. Exporters' & Traders' Compress, etc., v. Bargainer, Tex.Com.App., 45 S.W. 2d 563; Morgan & Bros. v. Missouri K. & T. Ry. Co. of Texas, 50 Tex.Civ.App. 420, 110 S.W. 978, writ of error refused. The rule as relates to cold storage warehousemen's liability for damage of perishable goods in storage, is correctly stated in 43 T.J. 957, sec. 41: "The duties and liabilities of a cold storage warehouseman

are the same as those of general public warehousemen except as general rules are qualified by the perishable nature of the goods or their susceptibility to deterioration. The general duty is to deliver the goods to the depositor or other person entitled, in the condition in which they were received, less their 'natural and inherent deterioration.'" The case of Belle Springs Creamery Co. v. Schultz, Tex.Civ.App., 69 S.W.2d 564, opinion by this court, is cited in support of the text supra. That rule is applicable in the instant case: To the extent of 10 percent "natural and inherent deterioration" which the evidence shows that the eggs suffered naturally for the time they were in storage, the said defendant is not liable therefor, but the defendant Milum's liability is not saved for the 90 percent deterioration of the eggs which the evidence shows would not have occurred if such eggs had been handled and kept with ordinary care by the defendant Milum in his warehouse (Herndon's testimony, supra). The above cited text writer (43 T.J. 958) recognizes exceptions, stating: "However, this exception does not save a warehouseman from liability where deterioration is hastened, is proximately caused by, or is contributed to by negligence in failing to maintain an equal distribution of the proper temperature to all the goods, or in improperly storing them." Citing for authority in support of the text, Southern Ice & Utilities Co. v. Stewart, Tex.Civ.App., 15 S.W.2d 132, error dismissed. Likewise, in the case at bar, there would be no presumption that the bad condition of the cold storage eggs resulted from defendant's negligence, if on trial of the cause evidence would have shown that the full deterioration was due to some other cause. "The owner of stored goods which have deteriorated or decayed through natural and inherent causes has the burden, in an action against the warehouseman for damages, of proving the extent of such natural and inherent deterioration; especially is this so where the goods were in storage for so long a time that manifestly the full extent of the injury was not and could not have been, caused solely by the negligence of the warehouseman." 43 T.J. 966, sec. 48.

In the case of Hislop v. Ordner, 28 Tex. Civ.App. 540, 67 S.W. 337, 338, the plaintiff and defendant were in the positions of bailee and bailor, as in the case at bar. Suit was for damages for the negligent death of a horse bailed to defendant. The court said: "Ordinarily negligence is never to be presumed, but must be proven like any other substantive fact, and the burden of proof is upon the plaintiff. But when the property is lost or injured while in the exclusive custody of the bailee, his servant or agent, it is incumbent upon the bailee to prove that the loss or injury was not occasioned by the negligence of himself, or his servants or agents. 3 Am. & Eng. Enc. Law (2d Ed.) p. 750, and cases cited; Pusey v. Webb, [2 Pennewill, Del., 490], 47 A. 701. The reason of the rule is apparent. The bailee has the sole possession and custody of the chattel bailed. He cannot return the article to the bailor in a damaged condition, or not return it at all, and by his silence defeat a recovery for the damage because of the bailor's inability to prove how the damage or loss happened. Although the burden of proof may rest eventually upon the plaintiff to establish his cause of action, until some reason is given for the injury to or loss of the property the bailee should properly be held answerable therefor. Rutherford v. Krause, [55 App.Div. 210], 66 N.Y.S. 781." See 5 Tex. Jur. 1039, sec. 29; Huie v. Lay et al., Tex. Civ.App., 170 S.W.2d 823; Mecom v. Vinton, Tex.Civ.App., 191 S.W. 763.

On this record, we are convinced that the action of the trial court in discharging the jury and rendering judgment in favor of the defendants should be reversed and cause remanded for a new trial; accordingly appellees' motion for rehearing is overruled.

YOUNG, Justice (dissenting on rehearing).

These eggs had been shipped out of Derry, New Hampshire, by the War Food Administration, waybill dated February 19, 1944; arrived in Dallas March 5, and apparently turned over to the City for distribution to charitable and relief outlets through D. P. Dysart, its purchasing agent, who arranged with defendant for storage of

the 500 cases. The shipment was given to the City of Dallas.

Upon reconsideration, I disagree with the majority judgment of reversal. In the first place, the suit was in the nature of a tort, against a public warehouseman, charging specific acts of negligence, and involved losses incident to storing of perishable goods. In such state of the pleading it is well settled that the doctrine of res ipsa loquitur has no application. Wichita Falls Traction Co. v. Elliott, 125 Tex. 248, 81 S.W.2d 659; Universal Atlas Cement Co. v. Oswald, 138 Tex. 159, 157 S.W.2d 636. Neither is res ipsa loquitur applicable (presumption of negligence) as against a warehouseman who receives perishable goods in good condition but returns them in bad condition. Said this Court in Belle Springs Creamery Co. v. Schultz, Tex.Civ. App., 69 S.W.2d 564, 568, speaking through Justice Bond and quoting from Southern Ice & Utilities Co. v. Stewart, Tex.Civ.App., 15 S.W.2d 132, "It is true that although the eggs were delivered in fresh condition to appellant, the mere fact, standing alone, that they were redelivered to appellee in inferior condition, would not justify the presumption of negligence on the part of appellant. That rule does not apply to chattels which deteriorate or decay through operation of inherent or natural causes."

Notwithstanding the principles just referred to and quoted, the majority now reverses the rule of liability relative to storage of a perishable commodity (carload of eggs) in the following language: "The delivery of property to a warehouseman for storage and the failure of such warehouseman to return the property, or if the property is returned in a damaged condition, the burden rests upon the warehouseman to show that the damage resulted without fault or negligence on his part. *In absence of proof to the contrary, the presumption of negligence prevails in such cases.*" (Italics mine.) Of course, a warehouseman may

be held liable for abnormal deterioration or decay of perishables proximately caused by improper storing or failure to maintain equal and proper temperature; 43 T.J., p. 958; in a cause of action so specifically pled and established, but we have no such case here under the complete record.

Secondly, the negligence alleged is that defendant allowed the temperature in storage room to rise, rendering the eggs unfit for human consumption on August 15, 1944 (date of loss); that he failed to turn the crates; stacked them upon the floor, allowing water to accumulate; storing potatoes, tomatoes and grapefruit in same room, etc. From a rather careful study of the statement of facts I have been unable to find a line of testimony in support of any of above charges. Highly material to defendant's liability, was the amount of eggs withdrawn for account of Parkland Hospital from March 1944 to date of alleged loss; Miss Von Goertz, dietitian, testifying that the Hospital withdrawals in March, April, May and June were "from 70 to 80 cases a week."* On this point the majority opinion recites: "Plaintiff's evidence admits that there were some withdrawals, but without the City records being available at the trial, the exact number of crates left with defendant after such withdrawals, and the exact amount of the City voucher given to defendant in payment for such storage, *were not disclosed.* However, there is evidence to the effect that there were in storage during the time the eggs were placed with defendant until they were withdrawn, 500 cases. Hence the amount of the voucher is only a matter of mathematical calculation, and, at least, there is evidence that the plaintiff suffered damage to the amount of 300 cases." (Italics mine.)

By what process of "mathematical calculation" the jury could have determined the number of crates left in storage or amount of the voucher in connection with an unknown quantity of crates over a period of

* It is proper to observe here that, attached to appellant's motion for new trial, is the affidavit of Miss Von Goertz. It recites in part that she intended to testify at the trial that such constituted *monthly* instead of *weekly* withdrawals; in which connection it was the further testimony of Mr. Dysart that withdrawals for hospital use from defendant's warehouse were being March 6 and April 26, then withdrawing eggs from another shipment at the Hinckley Ice & Cold Storage Company from April 26 until they were all gone, "which was the latter part of August or September."

time not stated, I do not know. Testimony of Mr. Dysart on direct examination merely emphasizes the uncertainty:

"Q. I will ask you if you know the amount of money which was paid to Mr. Milum for the storage of these eggs after August 15th, 1944? A. $146.30, according to the records of our City.

"Mr. Akin: We object, the records would be the best evidence.

"The Court: Do you know that yourself? The Witness: Yes.

"The Court: Did you issue the check? The Witness: No sir, I took the auditor's records.

"The Court: The objection is sustained, the records would be the best evidence.

"Mr. Chapman: The plaintiff excepts.

"The Court: Do you know independent of the record? The Witness: No, only that we had something over three hundred cases in there and were paying at the rate of ten cents per case. Of course, some were being withdrawn, *just how many we were paying on at that time, I don't know.*

"The Court: *The objection is sustained.*

"Mr. Chapman: The plaintiff excepts." (Italics mine.)

There is no other testimony in the record bearing on the majority finding that "there is evidence that plaintiff suffered damage to the amount of 300 cases." The Appellate Court in reviewing sufficiency of evidence on a question of fact, cannot consider heresay; Sinclair Prairie Oil Co. v. Perry, Tex.Civ.App., 191 S.W.2d 484; or excluded testimony; Supreme Council, etc., v. Landers, 23 Tex.Civ.App. 625, 57 S.W. 307; and see generally, 4 Tex.Dig., Appeal and Error, ▉▉▉▉▉▉

The facts above outlined, in my opinion, amply warranted the peremptory instruction given.

Concerning proof of negligence, the August inspection referred to in majority opinion, was by Miss Von Goertz of a crate out of the hospital refrigerator that was wet and damp, eggs falling through upon lifting, she not knowing, except from hearsay, that they were from a storage source. Mr. Dysart was never in that part of defendant's warehouse where City eggs were stored, knowing nothing about temperature of room; and there is no testimony of other perishables being in same vault with eggs. Defendant Milum, called by plaintiff, testified that the eggs in question were handled "just like you would store any other eggs;" stacked one case above the other, slats placed between floor and eggs, and between crates in stack; that air could circulate around the cases, "it being impossible to stack them otherwise;" that a special charge was made for turning eggs, which plaintiff had not arranged for, furthermore the eggs could "not have been turned."

Without further analysis it thus occurs to me that, viewing the specific acts of negligence charged, in light of the proof adduced, plaintiff has wholly failed to establish defendant's responsibility for these losses, except by way of mere surmise and conjecture. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059.

It is interesting to note that plaintiff introduced in evidence portions of defendant's abandoned pleading, which, if the City is bound thereby, Jenkins v. Tanner, Tex.Civ.App., 166 S.W.2d 167, Syl. 1, would acquit defendant of negligence in connection with the whole transaction. Paragraphs 14 and 16, in defendant's first amended answer, read: "Your defendant says that his warehouse space which he had available was not designed for nor was said warehouse equipped for a long storage of eggs, and that this fact was communicated to the said Dysart prior to the storage of such eggs, and your defendant further says that the eggs when received by him were packed so poorly that many of the cartons and the containers were already torn, broken and ripped, at the time such carload reached his warehouse, and that some eggs in such cases and cartons were already broken and that many of the eggs were small, dirty and cracked, and all of such eggs were generally of an inferior quality. * * * Your defendant says that the cooler room in which the car or eggs in controversy were stored, *was at all time maintained at a proper temperature to keep and preserve the eggs* and that stored in said cooler room were about ten carloads of eggs, that all of said carloads of eggs

have been withdrawn and that so far as known to your defendant, none of said carloads of eggs so withdrawn had spoiled or deteriorated." (Italics mine.)

Appellant urges error in the court's refusal to permit a reopening of the case for purpose of adducing further testimony. ·If I be correct in the conclusion that plaintiff did not make out a prima facie case after having been once accorded a right of reopening, then the trial court did not abuse his discretion in refusing to allow the case to be reopened a second time.

Appellant's third amended petition was upon contract of storage, in the alternative for damages based on detailed charges of negligence resulting in total loss of 334 cases of eggs, valued at $4,175. At close of plaintiff's evidence in chief, both defendants moved for an instructed verdict, which was granted; whereupon plaintiff moved to reopen the case for offer of additional evidence, which was granted. Further testimony was then had over 30 pages of the statement of facts, defendant Milum being recalled three times, Mr. Dysart twice. About 10:00 a. m., May 8, 1946, all parties again announced to the court that evidence was closed. On defendant's insistence, plaintiff then announced to the court that it had elected to stand on its tort and negligence action; and counsel for all parties were instructed to return at 11:15 o'clock, when the court's charge would be completed. At the appointed time the court openly announced his decision to enter judgment for defendant, making entry thereof upon the docket sheet, on the ground, among other things, that there was nothing in the record upon which the jury could find the number of cases lost. It was then that plaintiff's counsel asked that the case be reopened a second time for the purpose of offering testimony on the foregoing primary issue.

Obviously, no abuse of discretion was involved in the court's refusal to allow a further reopening; Puckett et al. v. City of Fort Worth, Tex.Civ.App., 180 S.W. 1115. If so, as suggested by appellee, then no court would be free from error, for had plaintiff been granted a second right to reopen, it could reasonably have requested a

third right, etc., and thus there would be no finality to litigation. I conclude, therefore, that defendant's judgment under the peremptory instruction given, should be affirmed.