UNIVERSAL ATLAS CEMENT COMPANY V. JOE OSWALD ET AL.

No. 7715. Decided December 10, 1941.
Rehearing overruled January 14, 1942.
(157 S. W., 2d Series, 636.)

*Harris & Gordon,* of Waco, for plaintiffs in error.

The finding of the Court of Civil Appeals that "rain water which percolated through the surface of the land to the hard rock would remain there for use in feeding plant life, but that if the rock foundation was cracked, the water would escape through the cracks and cause the sub-soil to dry out quicker," was without evidence in the record, and such finding presents

a question of law for determination by the Supreme Court as to whether or not there was evidence to support the finding of the Court of Civil Appeals. Beck v. Texas Co., 105 Texas 303, 144 S. W. 295; Lee v. International & G. N. Ry. Co., 89 Texas 583, 36 S. W. 63; Texas Emp. Ins. Assn. v. Booth, 113 S. W. (2d) 231.

*Fitzpatrick & Dunnam,* of Waco, for defendants in error.

MR. JUDGE BREWSTER delivered the opinion of the Commission of Appeals, Section A.

This is an action for damages brought by Joe Oswald and wife (defendants in error here) against Universal Atlas Cement Company (plaintiff in error here), in which the plaintiffs alleged that on land adjoining the farm of 138 acres on which they lived in McLennan County the defendant owned, operated and maintained a cement manufacturing plant, as a part of which it operated a quarry from which it blasted lime rock from a stratum of solid rock underlying both the farm of plaintiffs and the lands of defendant; that on plaintiffs' farm were two wells dug into the aforesaid stratum of solid rock which for many years prior to July 15, 1935, had continuously furnished ample water for plaintiffs' household use and for the livestock kept by them on the farm; that on or about July 15, 1935, the defendant in its quarrying operations caused "heavy, unusual and unreasonable and excessive and unnecessarily large quantities of dynamite" and other explosives to be exploded in its said quarry adjoining plaintiffs' farm thereby "causing the structure of the earth in and under plaintiffs' said farm to quake and vibrate in such manner as to break and damage the structure thereunder in such manner and to the extent as to release the water from plaintiffs' said wells and the subterranean water and moisture therefrom and permanently destroy said wells and reduce the value of said farm"; that such releasing of the subterranean moisture depleted the arable surface of the farm of the moisture necessary to the proper cultivation thereof and destroyed its fertility, its vegetation and crops as well as the grass which formerly grew in the pastures thereof to sustain plaintiffs' livestock; that said negligent acts proximately caused plaintiffs' damages, which were alleged to be $75.00 per acre, or a total of $10,350.00. Defendant's answer (in so far as our discussion is concerned) was a general denial and a special allegation that "it is necessary to use an explosive for the purpose of breaking up the

limestone so that it can be conveniently handled and transported from the quarry to its mill and that in the use of explosives in blasting the rock it exercises the highest degree of skill and care under the circumstances, and in accordance with the generally accepted practice followed by cement plants throughout Texas and the United States in the blasting of rock for the purpose of manufacturing it into cement," and that, therefore, the plaintiff's damages were not due to its negligence.

With the issue thus joined the jury found (1) that on or about July 15, 1935, the defendant used an excessive quantity of dynamite in blasting its quarry; (2) that such use was negligence; (3) that the use of plaintiffs' wells was destroyed on said date; (4) as a proximate result of defendant's negligence in using said excessive quantity of dynamite; (5) that the blasting on July 15, 1935, cracked the solid structure under plaintiffs' farm; (6) rendering said farm less productive; (7) that said farm was so rendered less productive as a proximite result of defendant's negligence in using an excessive quantity of dynamite; (8) that its reasonable market value was reduced as a proximate result of defendant's said negligence; (9, 10 & 11) that said reduced value was $6,900; (12) that defendant did not adopt the usual and customary practice in its blasting operations at its quarry; and (13) did not exercise ordinary care in carrying on said blasting operations.

Upon these findings the trial court entered judgment for plaintiffs in the sum of $6,900.00. The defendant duly appealed to the Court of Civil Appeals, which in all things affirmed said judgment. See 135 S. W. (2d) 591.

As we analyze plaintiff in error's assignments its principal complaints fall into two groups, namely (1) that the Court of Civil Appeals erroneously applied the doctrine of *res ipsa loquitur;* (2) that there was no evidence to show negligence on the part of defendant or that the same was a proximate cause of plaintiffs' damages.

■ We do not believe that the doctrine of *res ipsa loquitur* is applicable to this case. That principal is invoked where mere proof that an accident occurs is sufficient to cast upon the alleged wrongdoer the burden to show that such accident was not due to any negligence of his; that is, the thing bringing about a given accident being under the management of de-

fendant thereby placing him in a better position than was the injured party to forsee and avert the catastrophe, the accident is regarded as so unusual as that, in the very nature of things, it suggests negligence on the part of him who brings it about. See 30 Tex. Jur., sec. 131. Situations to which the doctrine has been applied as raising an inference of negligence where none was specially alleged or proved are: An automobile was so operated that it overtook and collided with a mortorcycle on which the injured party was riding on the proper side of the road at a reasonable and lawful rate of speed, Edwards v. Hawkins (Civ. All.), 77 S. W. (2d) 1098; a long freight train went off the track at a curve thereby loosing quantities of oil and gasoline onto plaintiffs' land sickening his cattle and rendering his land unfit for grazing purposes, G. C. & S. F. Ry. Co. v. Dunman et al. (Com. App.), 27 S. W. (2d) 116; plaster fell on the head of a customer in a store injuring him, Taylor v. Popular Dry Goods Co. (Civ. App.), 10 S. W. (2d) 191; a window screen fell into the street and struck a pedestrian, S. W. T. & T. Co. v. Sheppard (Civ. App.), 189 S. W. (2d) 799 (Er. ref.). In this case if plaintiffs had alleged generally that the defendant set off the blast and that the claimed damages to them proximately resulted therefrom, leaving negligence to be inferred from the fact of such blast we would be confronted with *res ipsa loquitur*. But they are not content so to pitch their case. They follow up their charge that the defendant set off the blast with an allegation of the specific acts which they say made it an act of negligence. Hence *res ipsa loquitur* is not in the case.

■ In submitting an inquiry to the jury covering plaintiffs' allegation that in setting the blast the defendant used heavy, unusual, unreasonable, excessive and unnecessarily large quantities of dynamite, the trial court properly chose and used the all-comprehensive word "excessive" after defining "excessive amount of dynamite" as being a quantity greater than was reasonably necessary in its blasting and greater than would be used by a person under the same or similar circumstances in the exercise of ordinary care in operating the quarry. Plaintiff in error asserts that there is no evidence to sustain the jury's finding of an affirmative answer that an excessive amount of dynamite was used in response to the aforesaid inquiry, thus presenting the question which we must decide, namely, is there *any* evidence that the quantity was excessive? We think so. Under the rulings of this Court, if it appears there is such evidence we have no alternative but to affirm the judgment,

164

it being within the exclusive province of the Court of Civil Appeals to determine whether the trial court's findings are contrary to the weight of the evidence. Texas Employers' Inc. Co. v. Moreno (Com. App.) 277 S. W. 84.

■ Under the testimony the distance from the point of blasting to plaintiff's wells varied from 900 to 1200 feet. It seems uncontradicted that the amount of explosive set off at the time in question was 2,600 pounds, 40 per cent. of which was nitroglycerine, well known to be a very powerful explosive agent, as is fully attested by the fact that from a solid limestone formation extending back toward and under plaintiffs' farm it tore off from sixteen million to twenty million pounds of rock, breaking the same into fragments varying in size from a man's fist to a desk. In this connection it must be borne in mind that each time the defendant was setting off dynamite that would break up such a stupendous quantity of rock it was getting ever closer to plaintiffs' wells and the subterranean waters underlying their lands. From the beginning of its operation in 1929 up to the blast under consideration it had advanced 1,400 feet and to within 1,000 feet of plaintiffs' larger well, considerably over half way. Can any one say that it never would advance to a point where it might reasonably foresee that its operations might damage plaintiffs' property? Assuredly not. Then how can we say that there was no evidence, no circumstances from which a reasonable inference could be drawn, to support the finding of the courts below that such point had been reached on July 12, 1935? The defendant sought to meet this inquiry by proof that the 2,600 pounds used was a "customary" load. On this point the record shows that of 19 blasts set off by the defendant at the quarry in question during the year 1933, in all but three the load used was less than 2,600 pounds, ranging from 2,500 down to 1,850 pounds; the other three, set on March 25, April 5 and April 17, 1933, were all 2,800 pounds. Of thirteen blasts set off during 1934, only one, that on December 1, carried a load of 2,600 pounds, all the others ranging from 2,500 down to 1,350 pounds. In 1935, to and including the explosion under consideration, seven blasts were set off, and only in those of April 22, July 1 and July 12 did the load amount to 2,600 pounds. So, if in the last thirty-nine blasts, including that in dispute, set off by the defendant only seven carried as much as 2,600 pounds load, it can hardly be said that the use of a load of 2,600 pounds on July 12 was "customary." And the fact that it was not cus-

tomary was a circumstance to be considered by the jury in weighing the question before them.

Is there any evidence of a proximate casual connection between the blast in question and plaintiffs' damages? Several of plaintiff in error's assignments relate to the matter of whether there was any evidence of such connection. The jury found that defendant's blast destroyed the use of plaintiffs' wells and cracked the solid structure under their farm, thereby rendering it less productive. The Court of Civil Appeals held the testimony sufficient. We believe there is some evidence to support this conclusion. There was testimony that the land had been drier and less productive since the blasting than it had been in prior years under similar weather conditions. There was evidence that before the blast water falling on the surface of plaintiffs' farm would seep down seven or eight feet where it settled on the solid rock formation (from which defendant was blasting) and remained there until drawn out by gravitation, evaporation and capillary attraction to sustain plant life on the surface during the summer months; and there was evidence that before the blast plaintiffs' two wells held water sufficient to furnish water for all home use and farm purposes. Both plaintiff Joe Oswald and his son testified that they were at one of the wells when the blast went off, that the earth trembled, the trees shook and the water then within eight feet of the top of the well rippled and shook. The next day the water was gone out of both wells and they have not held water since. And witnesses testified to finding cracks in the wells after the blast. Before the blast, during rainy seasons, water would seep out on the side of the hill. But there were no such seepings thereafter. There was testimony that the day after the blast there were cracks in the quarry pointing towards plaintiffs' wells and farm and that water was running therefrom onto the floor of the quarry. Experts testified that ordinarily on land such as plaintiffs' the rain water which percolated through the surface to the hard rock would remain there for use in feeding plant life, but if the rock foundation should be cracked the water would escape through the cracks and cause the subsoil to dry out quicker. The weight to be given this testimony as well as the credibility of the witnesses giving it were passed on by the trial jury. They established facts and circumstances and supported the inferences that the blast in question did crack the rock formation under plaintiffs' farm, thereby draining his wells and releasing the subterranean waters. There certainly was some evidence offered to support

the trial court's judgment and the Court of Civil Appeals' affirmance thereof and we cannot disturb their findings.

The defendant vigorously contends that there was no evidence to support the plaintiffs' allegation that the productivity of the land for farming purposes was reduced by reason of the excessive blasting. As stated, we think there was some evidence to support such allegation. But if we were to concede that there was no evidence to show that the productivity of the land was so reduced, the result would be the same, because very clearly there was evidence that the wells on the farm were destroyed by the blasting, and this in itself reduced the market value of the land. The court in submitting the case to the jury did not inquire separately the amount of damages caused by the reduction of the productivity of the land, but inquired only as to the reduction in the value of the land by reason of the use of an excessive amount of dynamite, and the jury fixed this amount at $6,900.00. We have no way of knowing that the jury took into account any improper element of damages or any element of damages not established by the evidence. Presumably they did not. Since there was evidence that the blasting destroyed the value of the wells, we may assume that the jury took this into consideration in determining how much the value of the farm had been reduced. The verdict may be excessive, but that is not a matter within the jurisdiction of this Court. There was no request for an instruction to the jury that there was no evidence to support plaintiffs' contention that the productivity of the land had been reduced by the blasting, and there was no instruction by the court to the jury that the jury might take such element into consideration in determining how much the value of the land had been reduced. There was, therefore, no error in this respect.

We regard it as unnecessary to discuss other assignments challenging the existence of evidence to support certain findings by the Court of Civil Appeals, as we believe they are disposed of, in substance, by what we have already said.

We believe the opinion of the Court of Civil Appeals correctly disposes of all other questions presented, hence discussion thereof is purposely omitted.

Accordingly, the judgment of the Court of Civil Appeals affirming the judgment of the trial court is in all things affirmed.

Opinion adopted by the Supreme Court December 10, 1941.

Rehearing overruled January 14, 1942.