**Hall JONES**

**v.**

**NAFCO OIL AND GAS, INC., et al.**

**No. A–9869.**

Supreme Court of Texas.

June 10, 1964.

Rehearing Denied July 15, 1964.

Sanders, Scott, Saunders, Brian & Humphrey, Amarillo, for petitioner.

Simpson, Adkins, Fullingim & Hankins, Amarillo, for respondents.

GRIFFIN, Justice.

This is a suit brought by petitioner, who was the plaintiff in the trial court, against respondent Nafco Oil and Gas (hereinafter called Nafco) and its employee, Sam Wysong, as defendants, for damages suffered by plaintiff's cattle. This damage was alleged to have been caused by the negligence of the defendants in permitting the escape of condensate, a liquid hydrocarbon, on the ground where plaintiff's cattle drank the same. Upon the conclusion of plaintiff's testimony, the trial court gave the jury an instructed verdict in favor of the defendants. This action was affirmed by the Court of Civil Appeals. 371 S.W.2d 584.

Plaintiff's application for writ of error was granted. The parties will be referred to by the designation they had in the trial court.

We affirm the judgment of the Court of Civil Appeals.

September 29, 1959, plaintiff was pasturing some cattle on the section of land in Hansford County, Texas, whereon defendant Nafco had a gas well which in addition to gas, produced as a by-product a hydrocarbon liquid referred to as distillate or condensate. This well was being produced by Nafco under an oil and gas lease dated in 1953, and covering the section of land whereon the gas well was located. This well had been producing for some five or six years prior to September, 1959.

Plaintiff Jones lived in Hansford County, Texas, and had been familiar with the section of land and the gas well thereon for some time prior to his taking a grazing lease from the owner of the land in May, 1958. This grazing lease of the surface was for a one-year period, and in May, 1959, plaintiff renewed the same for an additional year.

The gas well, separator, storage tanks and discharge pipe all were on the land May 1st in 1958, and continued to operate in the same manner and methods at all times prior to September 22, 1959, and on up to the date of trial of this cause in November, 1962.

Plaintiff Jones testified that prior to the time before September 22, 1959, he had not seen any liquid hydrocarbons out on the surface of that section anywhere. He testified he had been over all that section many times during the life of his grazing lease; that he had "never seen any liquid hydrocarbons loose or any indication of them being loose on that section"; that he knew that the contents of the storage tanks were trucked from the premises at irregular intervals by trucks which had the name "Groendyke" on them. He further testified that on September 22, 1959, around 2:00 or 3:00 o'clock in the afternoon was the first time he had ever seen any fluid, whether it was condensate or salt water or anything else, around that well location. Never before on that day, the preceding day nor any time before, had he seen any fluid spilled out there on the section.

Plaintiff testified that around 10:00 o'clock in the morning of September 22, 1959, the cowboy who was looking after the cattle on this section called into Spearman to plaintiff and reported some of the cattle were dead, and others sick and dying. Plaintiff immediately drove to the pasture, and seeing his cattle dead and dying got in touch with Dr. Rinker, a veterinarian, and took him out to see the cattle.

Dr. Rinker testified to seeing the cattle, performing two or more autopsies on dead cattle, and that from what he found as a result of the autopsies, it was his opinion that the cattle were suffering from liquid hydrocarbon poisoning. He treated a number of cattle that afternoon and until a little after dark. Dr. Rinker on cross-examination was asked: "To be perfectly fair and honest with us * * * you say that that (drinking liquid hydrocarbons) is possibly what caused it, and that is all you will say, isn't it?" He answered: "That is right."

The doctor and plaintiff each testified that about 2:00 or 3:00 o'clock that afternoon they went to the gas well and there observed a puddle of condensate or distillate at the end of a drainpipe connected to a valve at or near the bottom of each of the storage tanks. The evidence showed that all the equipment of this well, except the well head, was enclosed with a wire fence sufficient to turn the cattle in the pasture. The drainpipe extended from the storage tanks under the surrounding fence, and to a point 4 to 6 feet beyond the fence. At the end of this drainpipe was the puddle of liquid testified to by Dr. Rinker and the plaintiff, and one or two other witnesses. No witness saw any one or more of the cattle drink any of this liquid hydrocarbon at any time. Dr. Rinker and plaintiff testified they observed a discolored strip of grass where it appeared some of the liquid had run 30 to 50 feet down a slight slope. All witnesses who testified to this fact, testified there was no liquid on said slope, that the ground was not damp or wet, but was dry, and none saw any cattle eating any of the grass or drinking any liquid of any kind from this discolored strip which in their opinion smelled like and was caused by liquid from the end of the drainpipe.

Dr. R. H. Miller, Jr., a veterinarian from Amarillo, Texas, was called by plaintiff to examine his sick cattle. Dr. Miller reached the pasture September 24, 1959, and at Mr. Jones' request, performed an autopsy on a sick heifer which had been killed by Mr. Jones after Dr. Miller reached the pasture. Dr. Miller testified that from his autopsy of the dead animal he found symptoms indicating the heifer had died from liquid hydrocarbon poisoning. He also testified: "Those symptoms I just gave are common, commonly observed in this condition, but they can also be symptomatic of other conditions as well, other diseased conditions as well. They are not specific, in other words."

Mr. Sam Wysong, the only witness offered by defendants, testified he was the "switcher" employed by Nafco to keep the equipment on the well, the separator and the storage tanks in good repair, and to check the storage tanks to see they were emptied by Groendyke at such times as to prevent the waste of the condensate stored therein. He testified he was on this lease five days out of each week; that he and Herman Dye, Nafco's production superintendent in the field, were the only employees of Nafco who had keys that would unlock the valves at the bottom of the storage tanks and through which must pass the drainage from the tanks into the discharge pipe leading outside the fence enclosing the tanks; that a Mr. McRee, who drove the Groendyke tank truck into which the condensate was unloaded and transported to the destination as directed by his Nafco supervisors, also had a key to these valves; that Groendyke was paid by the barrel for each tank of condensate it hauled from the lease; that he would notify Groendyke when there was a tank truck load of condensate to haul away from the lease, but that he did not direct Groendyke where to deliver and unload the tank truck because Groendyke's employee knew where it was supposed to go. He further testified that he did not unlock the valves on the drainpipe prior to, nor on the day the cattle sickened and died; that the only time prior to September 22, 1959, that he had seen any liquid on the ground on this lease standing in a puddle at the end of the drainpipe or elsewhere was when Mr. McRee, Groendyke's driver, would drain off two or three barrels of water from the bottom of the tank, prior to unloading the tanks into Groendyke's tank truck; that this unloading took place on the average of every thirty (30) days to six (6) weeks, depending on weather conditions; that prior to that time he had never seen any discolored strip of grass or ground leading downhill from the end of the drainpipe.

On the afternoon of the 21st of September, 1959, he was at the well and gauged the tanks and determined they needed emptying and that when he reached Spearman, he notified Groendyke that the tanks

needed emptying the next day; that he had never seen these tanks overflow; that he did not open the drain valves, and that there was no leakage from these valves; that he did check the valves, other equipment and the drainpipe and there was no dripping of liquid from the pipe nor puddles of any liquid on the ground at this time; that he was again at this well about 8:00 A.M. the morning of September 22, 1959, and prior to Groendyke's unloading of the tanks, and again he inspected the premises and the equipment and the valves were not leaking, nor was there any puddle of liquid nor dripping from the drainpipe; that when he arrived on the lease that morning some of plaintiff's cattle appeared to be sick and some were lying down, but he could not say if any were dead.

Mr. Wysong was back on the lease the afternoon of September 22, 1959, and after he had been notified that plaintiff's cattle were sick, dead and dying. That he again was at the well and inspected the premises and found the drain valves locked and no leakage of the valves; that the storage tanks had been emptied by Groendyke since he was at the well at 8:00 A.M. that morning; that there was a small puddle of fresh liquid on the ground at the end of the drainpipe, and that he saw someone present stand on the end of the drainpipe and a small amount of liquid ran out of this pipe onto the ground; that he never saw any of plaintiff's cattle drinking from this puddle, nor around the well and equipment; that in his opinion, there was no leakage of the tank drain valves, and that the liquid which came from the drainpipe when it was pushed down, resulted from the fact that it was liquid left in the pipe when Groendyke's man, Mr. McRee, had bled the water off from the tank bottoms in order to unload the condensate from the top into Groendyke's tank truck.

Mr. Herman Dye, defendant Nafco's field superintendent September 22, 1959, testified he had a key to the drainage valves but he did not open these valves; that he also was on the lease the afternoon of September 22,

1959, and that he saw the puddle of liquid at the end of the drainpipes, and that it was fresh liquid. He saw someone depress the end of the pipe and the trickle of the liquid therefrom and had the same explanation for this happening as Mr. Wysong. Mr. Dye was put on the stand by plaintiff.

Mr. W. A. McRee, a witness for plaintiff, testified he worked for Groendyke as driver of a tank truck, and had been emptying Nafco's storage tank in question for some three to five years; that Mr. Wysong, Nafco's switcher, would call in to Groendyke's office that the storage tanks were ready to be unloaded and he would take Groendyke's tank truck to the storage tanks in question and pump his truck full of condensate from the top of the storage tanks; that on the bottom of the tanks would be accumulated water and other "dredges" (impurities) necessary to be drained off prior to beginning his loading operations; that he had a key to the drain valves at the bottom of the tanks and through which water and other impurities were drained out of the tanks so as to prevent these from being pumped into the truck; that he tried not to let any condensate drain out through this discharge pipe, but in order to be sure he had the water, etc. out of the tank, a small amount of condensate might also be drained out on the ground; that this was the way he had handled the operation at all times he had been picking up the condensate. He testified that he arrived on the lease around 10:00 o'clock the morning of September 22, 1959, and drove to the tanks; that he did not see plaintiff, Dr. Rinker nor any others on the lease; that he saw some of the plaintiff's cattle that were lying down and acted as if they were sick; he did not know if any were dead.

In driving up to the tanks to get his truck in the proper place to unload, he drove by the end of the discharge pipe and at that time there was no puddle of liquid at the end of the drainpipe, nor did he see any discolored strip of grass or ground; that he unlocked the drain valves at the bottom of the storage tanks and let four or five

gallons of liquid run out through the drain-pipe and the liquid collected in a puddle on the ground at the end of the pipe; that he saw no cattle around the well or the drain-pipe, nor drinking from this puddle of liquid. As soon as he had drained the water and impurities from the storage tanks, he closed the drain valves and locked them securely; that there was no leakage from the valves; that he loaded his tank truck and left the lease and took his load of con-densate to its destination.

We have set out the evidence at length, because this is a case where at the close of the testimony the trial court instructed the jury to return a verdict against plaintiff and in favor of the defendants.

In such cases we must examine all the testimony that is relevant to the issues of defendants' negligence, and consider the evidence in the light most favorable to the plaintiff, disregarding all conflicts and in-dulging in every intendment reasonably de-ducible from the evidence in favor of the plaintiff. 4 Tex.Jur.2d, p. 384, Appeal & Error—Civil sec. 835, and the authorities therein cited.

In Warren Petroleum Corp. v. Martin, 153 Tex. 465, 271 S.W.2d 410 (1954), this court had before it a case wherein Martin sought damages from Petroleum Company resulting from the death of Martin's cattle by virtue of having drunk crude oil stand-ing in puddles about five feet from War-ren's oil well. The well machinery was not enclosed with a fence. It was alleged that the pump used to pump oil from Warren's well was defective in permitting oil to be thrown up and out from the well and form in puddles about five feet from the well. The evidence showed that these puddles of oil had been seen on various occasions by various witnesses, and that plaintiff's cattle died as a result of drinking liquid hydro-carbons and that the cattle drank such oil and had access to no other liquid hydrocar-bons. Upon a trial to a jury, the jury found that Warren permitted oil to escape from the well; that such was negligence; that

the cattle drank such oil, and some died and others were injured as a result of drinking the oil; that Warren did not intentionally injure said cattle, and fixed the amount of damages. Judgment was for Martin and the Court of Civil Appeals affirmed this judgment. This court reversed and ren-dered the judgment granted by the trial court against Warren for the damages suf-fered by Martin as a result of his cattle drinking the oil, but affirmed damages done to growing crops, fences, etc. resulting from the action of Warren's employees.

This Court in the Martin case relied on the case of Carter v. Simmons (Tex.Civ. App.) 178 S.W.2d .743 (1944) no writ his-tory. This Court quoted from 30 Tex.Jur. Sec. 127 p. 800 as follows: "Negligence or a failure to perform a duty required by law is never presumed as a fact, but must be proved by evidence; and the burden of proving it is on the party seeking a recovery of damages by reason of such negligence or failure of duty." (Now found in 40 Tex. Jur.2d 657, Negligence Sec. 139.)

This court went on to quote further from Carter v. Simmons, supra, "In our opinion, the mere fact that appellant permitted the storage tanks to overflow, without any showing as to what the operating conditions on the leases might have been at such times, could not form the basis for a legal infer-ence that his conduct in this respect con-stituted negligence on his part or a breach of any duty which he might have owed to appellees under the existing circumstances."

In the Martin case, there was testimony from a witness that a well pumping oil, throwing oil out twelve or fifteen inches up in the air above the coupling, with the wind blowing that oil out over the ground and forming puddles of oil (as the testi-mony in that case showed were the facts) was not the "usual and customary method of producing, and the precautionary way of producing oil in the Olney territory." In discussing this evidence as showing neg-ligence on the part of the operator, this Court said: "This evidence of failure to

follow custom, which at the most only shows that the result accomplished was not the usual and customary result, does not aid in proving negligence in the absence of proof that the equipment on the lease was not the equipment customarily used or that the lease was not being pumped or handled in a way that was not customary."

In the case at bar all the evidence on the point shows that this lease equipment was such as customarily and ordinarily used in producing gas wells in this territory, and no contention was made to the contrary. There was testimony that some similar gas wells in this field ran their drainpipe into a pit where the water and impurities were caught, in the event there was a large quantity of water, etc. produced by a gas well. This testimony also showed the well here involved produced only small quantities of water, etc., along with its gas production.

In our case, plaintiff relied on acts of negligence on the part of Nafco and its employees in manual dumping, draining or purging of the condensate tanks and/or separator, turning a substantial quantity of condensate and salt water into the drainpipe and permitting it to flow outside the fence and form in puddles and pools when same was available to plaintiff's cattle.

■ There is no evidence in this record to sustain such allegation. Plaintiff himself testified that prior to September 22, 1959, he never had seen any puddles, pools or wet places on the ground caused by liquid hydrocarbons, during the eighteen months he had used this section for grazing his cattle. Plaintiff did not know, nor could he testify, who it was that operated the drain valves at the bottom of the storage tanks.

Plaintiff's witness, McRee, who drove the Groendyke truck carrying the condensate from the storage tanks off the lease, testified that there were no puddles or pools of condensate, or any other liquid around or near the well, or at the end of the drainpipe when he arrived at the well on the 22nd of September; that the ground and grass were dry and not damp. He testified that he, and he alone, opened the drain valves and drained off the water and other impurities; that he securely closed and locked these valves when he left and that the only liquid on the ground at the end of the drainpipe was what he had put there by draining the bottom of the tanks.

Also, McRee, testified, and this was the testimony of all witnesses who testified as to these facts, that plaintiff's cattle were down and sick, and perhaps some dead at the time McRee drove onto the lease that morning, and prior to his drawing the fluid out of the storage tanks onto the ground. Under this record, McRee was the agent of Groendyke, and if his act in draining the bottom of the tanks caused the death and damage to plaintiff's cattle, defendants would not be liable therefor.

■ Plaintiff relies upon the doctrine of res ipsa loquitur to establish negligence. The evidence fails to show that Nafco had exclusive control of these facilities and the draining of the storage tanks but shows that McRee, the agent of the independent contractor, Groendyke, also had a key to the drain valves, and that he was the only one—under this record—who caused any liquid hydrocarbon to be drained on the ground. Under the circumstances, the doctrine of res ipsa loquitur is not applicable. Wichita Falls Traction Co. v. Elliott, 125 Tex. 248, 81 S.W.2d 659 (1935); Universal Atlas Cement Co. v. Oswald, 138 Tex. 159, 157 S.W.2d 636 (1–3) (1941); Carter v. Simmons (Tex.Civ.App.) 178 S.W.2d 743 (1944); Warren Petroleum Co. v. Martin, 153 Tex. 465, 271 S.W.2d 410, 413.

Plaintiff alleged that the acts of defendants constitute an unreasonable, unauthorized and excessive use of the lands upon which plaintiff grazed his cattle, and such caused the injuries and death suffered by the cattle. As we have pointed out above, there is no evidence that Nafco or its employees did anything to cause the only puddle or pool of liquid hydrocarbons shown by the evidence herein. Neither is there

any evidence that permitting the liquid to be discharged from the drainpipe was an unauthorized, unreasonable, or excessive use of land to produce, store and market the condensate, nor that Nafco was guilty of any negligence in connection therewith. Therefore, plaintiff cannot recover on this count in his petition. General Crude Oil Co. v. Aiken, 162 Tex. 668, 344 S.W.2d 668, 670.

The judgment of the Court of Civil Appeals is affirmed.