Birdie Irene **BIRMINGHAM** et al.,
Appellants,

v.

**GULF OIL CORPORATION** et al.,
Appellees.

No. 631.

Court of Civil Appeals of Texas,
Corpus Christi.

March 29, 1973.

Rehearing Denied May 10, 1973.

Trimble & Dobbs, J. B. Trimble, Corpus Christi, for appellants.

Allison, Maddin, White & Brin, Harry F. Maddin, Dyer, Redford, Burnett, Wray, Woolsey & Dunham, Cecil D. Redford, Corpus Christi, Lloyd, Lloyd, Dean & Ellzey, Parker Ellzey, Alice, Keys, Russell, Watson & Seaman, James C. Watson, Dudley B. Foy, Jr., Branscomb, Gary, Thomasson & Hall, Richard A. Hall, Corpus Christi, for appellees.

## OPINION

NYE, Chief Justice.

This is a wrongful death action. Birdie Irene Birmingham, the surviving widow of Hope Birmingham, brought suit against a number of defendants to recover damages for the death of her husband who received injuries resulting in his death when a crane owned by Gulf Oil Corporation fell from a drilling platform located in the Gulf of Mexico offshore from Mustang Island. The plaintiff was joined in the suit by her adult married daughter who assigned any right of recovery to the plaintiff. The trial was to a jury. At the close of plaintiff's evidence the trial court instructed a verdict for the defendants.

Plaintiff has appealed from the take-nothing judgment.

Hope Birmingham, plaintiff's husband, sustained injuries on April 14, 1967, which caused his death, when a Lorain MC–425 crane he was operating fell from the drilling platform onto a barge. The crane was manufactured by the Thew Shovel Company, the corporate predecessor of Koehring Company. Brewster-Bartle Drilling Company, Inc., the corporate predecessor of Diamond M Drilling Company, Inc. (a defendant), purchased the crane in January 1956 from Head & Guild Equipment Company (a defendant) and used it on the offshore drilling platform owned by Gulf Oil Corporation (another defendant). At the completion of the workover operations in 1956, Brewster-Bartle sold the crane to Gulf. In December 1966 Flournoy Drilling Company (a defendant) contracted with Gulf to work over two oil wells owned by Gulf which were located underneath the drilling platform. The workover operations began in December 1966 and continued until April 1967. The workover operations had been completed and the equipment belonging to Flournoy Drilling Company was being taken off Gulf's platform at the time the accident occurred. The crane was a part of the permanent equipment located on the drilling platform owned by Gulf. It was designed to lift all the equipment, personnel and supplies onto and off the platform. Light loads were transported to and from the platform by helicopter. The crane in question had a rated lifting capacity of 25 tons with a 30 foot boom at a 10 foot radius. At the time of the accident the boom had been extended to 80 feet. This rated lifting capacity varied with the length of the attached boom and the distance the boom is extended from the crane. The crane sits upon a circular base called a bearing race ring gear, which rotates. It is bolted to the bearing race ring gear by 12 bolts $1\frac{1}{8}''$ in diameter, eight of which were $4''$ long and four were $4\frac{1}{2}''$ in length.

Under the workover contract, Gulf agreed to furnish the crane to Flournoy for the workover operations. In December 1966 Flournoy Drilling Company employed Hope Birmingham, the deceased, to operate the crane. By April 14, 1967, Flournoy had completed its workover operations on the wells and was removing its equipment from the platform onto a barge. The various pieces of equipment had been weighed by Flournoy who had planned where each piece of equipment was to be placed on the barge. Kalvin B. Gernandt, the tool pusher for Flournoy, gave the directions for the loading of equipment from the platform to the barge. He signaled to the deceased who was operating the crane, telling him what to pick up and where to place it on the barge. On the morning on which the accident took place, the crane had lifted various pieces of equipment from the platform onto the barge, including a superstructure in two pieces, one of which weighed 19,000 pounds and the other 20,000 pounds, and a draw works weighing 23,700 pounds. Later, a pump weighing 12,580 pounds was picked up and lowered to within four feet of the deck of the barge. It was then held in this stationary position. At that point, the barge was ordered to be moved up a certain distance so that the pump could be lowered and positioned at a particular place on the barge. All of this was planned by the tool pusher. The sea was calm. The crane held the pump in this stationary position, approximately four feet above the deck of the barge, for a period of about five to ten minutes while the barge was being positioned. Gernandt, the tool pusher, who was standing at the edge of the platform, watched the barge and gave orders to the crane operator. The bolts holding the crane in place, failed. Gernandt testified that he heard some snapping and popping. He looked up and saw the crane fall over the edge of the platform. The crane hit the deck of the barge and slid into the water. Hope Birmingham was lodged under some of the equipment on the deck of the barge. He

died two days later as a result of the injuries he received from the accident.

The plaintiff alleged that the defendants were guilty of negligence in the installation and maintenance of the crane in question. Specifically, she alleged that the defendants failed to provide a safe place for her husband to work; failed to properly maintain the crane; failed to make reasonable and proper inspections of the bolts which failed; failed to discover rusted and corroded bolts; were negligent in installing bolts with less strength than manufacturer's specifications; failed to warn the deceased of the unsafe conditions where he worked; and finally, that she had a right to recover based on the theory of res ipsa loquitur. It was alleged that all of these negligent acts were a proximate cause of the toppling of the crane and the resulting death of plaintiff's husband. Plaintiff's appeal assails the trial court's instructed verdict in fourteen points of error which state in effect that there was evidence which raised a material issue of fact on each of the above allegations of negligence and evidence that such was a proximate cause of his death.

The law is well settled that on an appeal from a judgment from an instructed verdict an appellate court must review the evidence in the light most favorable to the losing party's position, disregarding all conflicts in the evidence and indulging every intendment and inference reasonably deducible from the evidence in favor of the losing party and against the instructed verdict and the judgment of the court. Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953); Seideneck v. Cal Bayreuther Associates, 451 S.W.2d 752 (Tex.Sup.1970). If the record reflects any testimony of probative force in favor of the losing party, the instruction must be held improper. An instructed verdict is warranted only when the evidence is such that no other verdict should be rendered. If there is any conflicting evidence in the record of a probative nature, a de-

termination of the issue is for the jury. White v. White, 141 Tex. 328, 172 S.W.2d 295 (1943); Air Conditioning, Inc. v. Harrison-Wilson-Pearson, 151 Tex. 635, 253 S.W.2d 422 (1952). In reviewing all of the evidence that was before the trial court, we must keep in mind that the controlling question before us is whether there is any evidence in the record which would, if accepted by a jury, have raised an issue of fact which would have supported a judgment for the plaintiff. Freitas v. Twin City Fisherman's Cooperative Association, 430 S.W.2d 579 (Tex.Civ.App.1968, n. r. e.).

The evidence before us is voluminous. The case took fifteen days of actual trial to put on plaintiff's evidence. The plaintiff produced 101 exhibits, 300 interrogatories, 3 sets of stipulated facts and 12 depositions, all of which covered 1621 pages in the statement of facts. Detailing of this evidence is important to the decision of this Court.

In March 1956, while the crane was being operated by Thomas Manning, the tool pusher for Brewster-Bartle, the bolts in the base of the crane sheared off and the crane eased down on a load that it was attempting to lift. Manning testified that the crane was lifting a 20 inch blowout preventor weighing approximately 20,000 pounds at the time of this occurrence Because of the position of the load, Manning knew that this particular lifting operation was overloading the crane causing the bolts at the base of the crane to break. Because the boom of the crane was over the platform at the time the bolts broke (in 1956), the blowout preventor settled to the deck of the platform and the crane did not fall from its pedestal. Gulf was notified of the breaking of the bolts at the base of the crane. Thomas Manning ordered new bolts which were furnished by the Lorain Crane dealer, Head & Guild. Thomas Manning, the tool pusher, installed the 12 new bolts in March 1956, using rig labor. He admitted that he knew nothing about the type of bolts, the material or strength of bolts, and he did not know of the type required and specified to be placed in the base of the crane. He testified that the rig laborers tightened the bolts as tight as they could tighten them. He stated that he did not know how much torque should be placed on the bolts in tightening them and did not know that the crane manufacturer had specified that the bolts should have a designed amount of torque in tightening them. There was evidence that the proper amount of torque in tightening the bolts was a 100 foot pounds and the use of a torque wrench to apply the proper amount of torque is important. If a bolt is underloaded it creates a serious problem with reference to the looseness of the plates of metal that are bolted together. If they are overtightened one may exceed the yield point of the metal and distort the threads. The expert witness stated that it was important how the bolts were installed as they should have the proper amount of torque applied to them. There was no evidence, however, that the threads of the bolts were distorted because of overtightening nor was there any evidence that the bolts were not tight enough which could have caused the shearing or breaking of the bolts.

Mr. E. C. Breklebaum, who was responsible for the planning, designing and manufacturing of the crane in question, testified that the 12 bolts designed to be used to anchor the base of the crane to its pedestal, were fine-threaded bolts, having 12 threads per inch with hexagonal heads. He testified that fine threads were prescribed because of their superior clamping properties. He testified that the bolts specified by the manufacturer had a proof load of 63,350 pounds per bolt and were made of medium carbon steel. The specified bolts are capable of carrying or withstanding well in excess of the stress or load for which the crane was designed. He said that the ultimate strength of the designed bolt was 89,900 pounds per bolt.

Breklebaum testified additionally that the crane manufacturer recommended that

the bolts by which the crane was fastened to the base be inspected as set forth in the operator's manual (the manual was not introduced into evidence). He stated that "the inspection and maintenance of any piece of construction equipment is a continuing obligation on the user thereof and it should be inspected and maintained on a daily basis."

When the crane broke from its mount in April 1967, the time of this accident, it was noticed that two of the bolts were not as the manufacturer had specified. One of the bolts was a square headed bolt with coarse threads and the other had coarse threads although it did have a hexagonal head as specified.

The plaintiff called as an expert witness, Mr. Richard Matthaei. He testified that the square headed bolt, (one that was different from that specified by the manufacturer), has seven threads per inch instead of twelve. He stated that this affected the strength of the bolts, its load or clamping capacity. The lesser number of threads has a lower proof stress value. He said that when bolts of twelve threads per inch are used rather than seven or eight threads per inch, there will be between ten and fifteen percent more loading capacity. Two of the twelve bolts had the coarse threads which presumably had less loading capacity. There was no evidence, however, that the use of these two different bolts caused the bolts to break and the crane to fall from its pedestal.

Mr. Matthaei testified that in the Gulf of Mexico there is a never ending, never ceasing problem of maintenance because of rust. He stated that there should be a maintenance program to apply a protective film of some sort on all steel to keep it from rusting. That to prevent rusting or corrosion an inhibitor or a protective coating must be used. He stated that any equipment that is not subject to any other action except the atmosphere, the protective should be removed and replaced every two years. He testified that where there is an external protective coating on equipment that is subjected to vibrational and cyclic stresses, this type of equipment requires close control procedures. He testified that the amount of rusting depends upon the length of time in which the bolt stands in a particular place and depends upon the humidity concentration. He testified that the humidity concentration is high in the Gulf of Mexico and that in 24 hours of 50% humidity, carbon steel (of which the bolts were made) without protective coating, will begin to rust and if it remains more than 24 hours the rust will increase. Other witnesses testified as to rusting and corrosive possibilities. Mr. Ray Charitat, production foreman for Gulf Oil Corporation, stated that salt air is highly corrosive and that just the fact that the crane had been sitting out there for nine or ten years is in itself reason to think that something can happen to it from the elements. However, Charitat testified that the bolts that were recovered at the time of the accident (and he saw them while they were still in place in the top of the pedestal on the day of the accident) were not rusted or corroded.

Eugene Elledge, a mechanic, testified that the crane was exposed to the Gulf weather; that Gulf weather caused rust and that the cab of the crane was rusted. In fact, he testified that the seat of the crane was rusted off and had to be replaced.

Mr. David Wheeler, an expert commercial photographer, who went out to the platform three days after the accident, photographed all of the bolts that were then recovered and later photographed them in his studio under lights. The photographs showed that the bolts were very greasy at that time. Mr. Wheeler testified that the bolts he photographed were not rusted or corroded. Charitat testified that rust inhibitors and protectives were routinely used and that a heavy oil base protective substance was routinely applied to the crane and structure as a matter of routine maintenance on the platform.

Although some of the bolts that were introduced into evidence bore some rust at the time of trial, the evidence showed that some were recovered from the bottom of the Gulf of Mexico, others from the crane which had also been recovered from the depths, and the remaining bolts were unaccounted for from the time of the accident until trial. No one testified that they saw any broken or stripped bolts with rust on them at the time of the accident. The only evidence that any of the bolts were rusted or corroded came from the testimony of Mr. Matthaei. He stated that you could expect that a change would take place such as oxidation and rusting in bolts that were left in the same position for a period of eleven years. Testifying as to one of the exhibits which was a sack containing stripped rusted-looking threads from a bolt Mr. Matthaei stated that a cause for the threads to come off the bolt, was rust. Rust reduces the cross-section on a threaded member, thus reducing the ability of the threaded member to support the load which is in contact with it. He testified that the effect of rust on threads would cause the threads to come off. Although he testified that rust could cause the threads to strip, he did not testify that rust was the cause of the bolts in question to fail. The record showed that seven bolts broke and five stripped.

Irrespective of the duty to use rust preventives, there was no direct evidence that the bolts which secured the crane to its base were corroded or rusted. There was no evidence that the bolts were not greased or that rust preventives had not been applied to them.

A hypothetical question was propounded to Mr. Matthaei. He was asked: "Mr. Matthaei, you will assume that the crane in question was purchased in 1955 by Brewster-Bartle Drilling Company and installed on the drilling platform owned by Gulf Oil Corporation located in the Gulf of Mexico offshore from Mustang Island, being installed on the pedestal having dimensions eight feet by eight feet by eight feet and fastened to the pedestal with twelve bolts whose diameters were 1⅛ inches, that in 1956 it lifted equipment off the platform after the completion of a workover operation, that in 1958 or 1959, according to Mr. Charitat, oil production foreman of Gulf Oil Corporation, it lifted a piece of equipment weighing 20,000 pounds; that in 1961 wells serviced by the platform were worked over and the crane lifted the workover machinery onto and off of the platform, that in the latter part of 1966 or early months of 1967 there was another workover and the wells serviced by the platform and the crane in question lifted all machinery onto the platform, that the crane in question remained in the position in which it was installed and not lifted from that position, that on the morning of April 14, 1967, while holding a pump in a stationary position the bolts in the base of the crane broke and stripped and the crane fell, from these assumed facts and from your inspection of the bolts and your inspection of the photographs of the bolts, pedestal and top of the pedestal, do you have an opinion as to why the bolts failed?" Mr. Matthaei stated that in his opinion the failure of the bolts was from fatigue. He said that fatigue is related to load per unit cross-section; that fatigue comes about as a result of cyclic or vibrational stress that occurs to any discontinuity in the metal surface, which in this case is the root of the threads of the bolting assembly; that fatigue takes place in two manners; that its inception usually occurs as a result of microscopic cracking at the root of these discontinuities, which in this case is the threads; that this microscopic cracking will gradually close with a stepline formation or clam shell appearance until the cross-section area of the bolting material has been reduced to a point where it will no longer sustain some load or some weight; that he finds evidence of this fatigue fracture on the bolts themselves.

At another time Mr. Matthaei was asked "just what is a fatigue type failure?" Mr. Matthaei stated that fatigue is a name

that suggests it gets tired, but that is not perhaps a true definition; that fatigue is related to cyclic loading or stressing or vibrational stressing which is a part of the fact of the failure by fatigue; that initially a tiny or microscopic crack appears; that in the case of the crane in question there are two different types or sources of fatigue stresses: One is the cyclic effect of the loading of the crane itself when the boom is extended when it is raising a piece of equipment; and second it can happen as a result of the operation of the engine which controls the crane. This stress is vibrational in nature. A fatigue type failure is a progressive or successive type failure resulting in what he calls a conchoidal fracture or a clam shell pattern. It starts with a tiny crack, when a load is applied. When a load is reapplied perhaps with a different amount of weight at a different period of time, the crack continues across the bolt. It takes a kind of a curved-like surface appearance until it comes to some point where the remaining cross-section of the bolt is insufficient to support the load that may be suspended from it. The result is what he describes as a simple cup and cone fracture.

Mr. Matthaei was asked what could bring about this type of fatigue failure. He stated that in general, fatigue failures originate from an external stress source that may be due to a source of stress which is vibrational or cyclic; that it can be initiated as a result of some surface condition which means that the surface condition is not uniform, such as a scratch in the root of a thread or a flaw in the metal, and that any one of these things can cause fatigue failure, in conjunction with the method of stressing it, either by vibration or by physically stressing it in cyclic manner.

Mr. Matthaei was questioned as to what preventive measures could be used. He testified that a preventive measure to the fatigue fracture is bolt replacement. When asked when bolt replacement should be done, he stated it would depend upon the result of a dye-penetrant test. He described the dye-penetrant test as follows: The metal is inspected, cleaned and a solvent is applied to be sure all of the extraneous material is removed. Then a dye-penetrant is applied (red or yellow dye). If the fatigue crack is large enough, the dye will show it. It was his opinion that the bolts should be removed and given the dye-penetrant test, generally speaking, on one year maintenance cycle.

Mr. Matthaei testified that the bolt replacement would depend upon the result of the dye-penetrant test in which the bolts are removed, cleaned and subjected to dye. In his opinion this should be done annually on the critical load bearing bolts. He admitted that "a very small crack cannot be detected by this procedure." Mr. Matthaei also stated on cross-examination that although he would like to see this testing done in this particular way, he admitted that it was not very practical to use this test annually on every one of the thousands of bolts in the crane. But, he added: "I would like to see it done that way." Plaintiff's expert witness, Mr. Matthaei, went on to say that the material that the bolts were made of is a ductile material. "Normally you would not expect it (this type of material) to fail from fatigue."

Another witness, Eugene Elledge testified that the only way that he knew to inspect the bolts in the base of the crane would be to remove them; that the holes where the bolts are placed, are machined to fit the bolts and the bolts would have to be tapped into place; that some of the bolts would have to be burned out, the heads and nuts burned off and the bolts driven out in order to get them out. This would, of course, destroy the bolts.

Gulf Oil Corporation admitted that they had not maintained any inspection or maintenance records concerning the crane or the specific bolts in question. But this in itself was no evidence that the crane wasn't inspected and maintained. There was no evidence that the bolts in question

which sheared off, were suffering from fatigue for one year, one day, or one hour before the accident. There was no evidence that any inspection which was not performed would have been performed by any ordinary prudent crane owner, drilling contractor or crane servicing company. There was no evidence that such an inspection would have revealed anything other than perfectly sound bolts. There was no evidence that the particular test suggested by Mr. Matthaei, was recommended by the crane manufacturing company or that that particular test was a custom in the industry. No other crane owner or operator testified that he used this test or that anybody else in the industry used this type of test to determine fatigue. The only evidence was that this was a possible test for detection of some fatigue cracks that were more advanced than the microscopic stage.

Mr. Matthaei stated that if the bolts had been installed in 1961 or 1965 or three months before the accident, they still could have failed in this same manner. "It's a ticklish question because fatigue is a problem that can occur overnight."

■ The defendants maintain that they cannot be charged with negligence because of their failure to carry out an unreasonable and imprudent testing and inspection of the bolts in question. We agree.

"The rule is stated in 65 C.J.S. Negligence § 87: '. . . Failure to make certain tests is not negligence where it does not appear that such tests are common or prudent, and no liability may be imposed by reason of the failure to make an inspection where the inspection, if made, would not have disclosed the particular defect causing the injury, or where the owner has no reason to think an inspection is necessary . . .'" Western Textile Products Co. of Texas v. Sidran, 153 Tex. 21, 262 S.W.2d 942 (1953).

There was no evidence that the defendants' conduct in failing to inspect and test the bolts as recommended by plaintiff's expert witness was a substantial factor in bringing about the harm.

The Supreme Court of Texas put it this way:

"Negligent conduct is, in law, a cause in fact of harm to another only if it is a substantial factor in bringing about the harm. Hopson v. Gulf Oil Corp., 150 Tex. 1, 237 S.W.2d 352, 355 (1951) . . . negligent conduct cannot be regarded as a substantial factor in bringing about the harm if the harm would have been sustained even if the actor had not been negligent . . . The rule is known as the 'but for' rule. We recognized the soundness of the rule and applied it to the facts in Biggers v. Continental Bus System, 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359, 365 (1957). . . ." Texas & Pacific Railway Company v. McCleery, 418 S.W.2d 494 (Tex.Sup.1967).

■ It is fundamental in negligent cases that responsibility must be predicated upon a causal connection between the negligence alleged and the injury complained of, and the proof must be such as to establish causal connections beyond the point of conjecture. Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949). The proof must show more than a possibility. The occurrence of an accident is not of itself evidence of negligence. There must be a cause which produces an event and without which the event would not have occurred.

■ Proximate cause must also have the element of foreseeability: Foreseen by a person of ordinary prudence that the event, or some similar event would have resulted as a natural and probable consequence. Baumler v. Hazelwood, 162 Tex. 361, 347 S.W.2d 560 (1961); Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359 (1957). We hold that although the evidence at best may raise more than a mere surmise or suspicion of negligence on the part of one or more of the

defendants, there was no evidence of proximate cause.

■ Appellant's last point complains of the ruling of the trial court where they contend that their cause of action was based upon the doctrine of res ipsa loquitur to establish negligence. In order to invoke the rule which involves this doctrine, the instrumentality, which caused the injury complained of, must be under the exclusive management or control of the defendant; that the reasonable evidence shows that the accident arose from a want of care in the absence of an explanation; and the accident must be such as in the ordinary course of things does not happen if those who have the management or control of it, use proper care. See Owen v. Brown, 447 S.W.2d 883 (Tex.Sup.1969). For one thing, the evidence in the instant case does not show that appellees had the exclusive control of the crane. The evidence showed that Hope Birmingham was the operator of the crane and had control of its operation at the time of the accident. Under these circumstances the doctrine of res ipsa loquitur is not applicable. Jones v. Nafco Oil & Gas, Inc., 380 S.W.2d 570 (Tex.Sup.1964). All of appellant's points of error are overruled.

Judgment of the trial court is affirmed.