Birdie Irene BIRMINGHAM et al.,
Petitioners,

v.

GULF OIL CORPORATION et al.,
Respondents.

No. B–4070.

Supreme Court of Texas.

Nov. 13, 1974.

On Second Motion for Rehearing
Dec. 11, 1974.

Trimble & Dobbs, J. B. Trimble, Corpus Christi, for petitioners.

Allison, Maddin, White & Brin, Harry F. Maddin, Keys, Russell, Watson & Seaman, James C. Watson, Dyer, Redford, Wray, Woolsey, Burnett, & Dunham, Cecil K. Redford, Branscomb, Gary, Thomasson & Hall, Richard A. Hall, Dudley B. Foy, Jr., Corpus Christi, Lloyd, Lloyd, Ellzey & Lloyd, Parker Ellzey, Alice, for respondents.

## ON MOTION FOR REHEARING

REAVLEY, Justice.

Hope Birmingham was killed by the fall of a crane owned by Gulf Oil Corporation.

His widow brought this wrongful death action against Gulf and others. At the close of plaintiff's case-in-chief, the trial court directed the verdict in favor of all defendants. The Court of Civil Appeals affirmed the take-nothing judgment against plaintiff. 494 S.W.2d 946. We order a new trial as to Gulf; we agree that no cause of action was proved against the other defendants.

In December of 1966 Flournoy Drilling Company contracted with Gulf to work over two oil wells owned by Gulf which were located beneath its drilling platform in the Gulf of Mexico offshore from Mustang Island. This workover operation continued for four months until April 14, 1967, when the equipment belonging to Flournoy was being moved from the platform into a boat for transportation back to land. Hope Birmingham was employed by Flournoy to operate the crane and did so during the entire period of this work at the Gulf wells. On April 14 he and the other Flournoy employees had virtually completed loading the boat when the accident occurred. A pump had been lifted from the platform and was being held in a stationary position while the boat was moved to the point where the pump could be deposited aboard in the desired place. After a wait of some 8 to 15 minutes while the pump was held by the crane in this position, the crane suddenly toppled, struck the boat and then fell into the Gulf of Mexico. Birmingham fell with the crane to the boat. He died two days later without regaining consciousness.

The fall of the crane was due to a failure of bolts which held it on a mount or pedestal sitting on the drilling platform. The crane was purchased new in January of 1956 by Brewster-Bartle Drilling Company, used during the original drilling of these wells, and then sold in 1957 to Gulf. It remained on this same drilling platform until it fell into the water in 1967. Plaintiff's efforts at discovery, by interrogatories and depositions, disclosed very little about the use, repair and maintenance of the crane—and, in particular, the bolts at its base—except that Gulf itself was without information. On at least three occasions, independent contractors had worked on the crane to keep it operational. Apparently no inspection or precaution had been taken for the maintenance or replacement of the bolts which secured the base of the crane. The Gulf employee in charge of repair and maintenance knew of no inspection having ever been made nor whether the bolts had ever been removed or tested. He had directed the crane dealer, Head & Guild Equipment Company, to make repairs "as needed" prior to the beginning of the Flournoy workover, but the Head & Guild personnel only checked the operation of the moving parts of the crane.

Plaintiff called an expert witness, a metallurgist, who testified from a visual examination of the remains of the bolts that their failure was due to metal fatigue. He explained that the cause of fatigue is cyclic loading or stressing of the metal, and he said that these bolts would not be expected to reach fatigue unless subjected to more than a million stresses at weights exceeding 52,500 pounds (half the tensile strength of the bolts). It was the opinion of the witness that repetitive loads in excess of this weight preceded the collapse of these bolts. Gulf apparently contends that Birmingham had overloaded the crane and that this was the cause of the collapse, but the evidence in the record at the point of the directed verdict was to the contrary.

If Gulf owed a duty to Birmingham and if there is evidence of a breach of that duty which proximately caused Birmingham's death, Gulf was not entitled to an instructed verdict. Birmingham was an invitee on Gulf's platform and in operating its crane, and to him Gulf owed the duty to take reasonable precautions to protect against foreseeable danger. Guidry v. Neches Butane Products Co., 476 S.W.2d 666 (Tex.1972); Carlisle v. J. Weingarten, Inc., 137 Tex. 220, 152 S.W.2d 1073 (1941).

The Court of Civil Appeals has held that there was no evidence of negligence on the

part of Gulf and, further, that there was no evidence of proximate causation linking a failure of Gulf to Birmingham's injury.

■ It was the duty of Gulf to exercise care to see that Birmingham would have a safe place in which to work. Gulf personnel knew, as do we, that heavy machinery requires regular maintenance and that load-bearing parts must be inspected and replaced, at intervals of time which depend upon the instrumentality and its use, or ultimately the machinery will collapse. Reasonable men know that these precautions are required and foresee dangerous consequences if nothing is done.

■ The physical circumstances here make it impossible for the plaintiff to prove the precise mechanism of the metal failure in the bolts and to prove the time at which each stage in that process occurred. The law does not bar recovery by plaintiff in such case; it "only demands the best proof of a transaction that it is susceptible of, and when that is produced then it becomes a question whether or not its probative force is such as to establish its existence." Miller v. Fleming, 149 Tex. 368, 233 S.W.2d 571, 575 (1950). To recover for an injury claimed to have been caused by tortious conduct of the defendant, the plaintiff is only required to prove that an accident probably resulted from the negligence of the defendant. Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609 (1951); Burlington-Rock Island R. Co. v. Ellison, 140 Tex. 353, 167 S.W.2d 723 (1943). Both negligence and proximate cause may be established by circumstantial evidence. J. Weingarten, Inc. v. Brockman, 134 Tex. 451, 135 S.W.2d 698 (1940); Bock v. Fellman Dry Goods Co., 212 S.W. 635 (Tex. Com.App.1919).

The plaintiff Birmingham alleged that Gulf failed to make proper inspection and to discover the danger of the bolts. The inability to establish that a reasonable inspection would have led to timely detection of metal fatigue of the bolts presents this plaintiff with the impossible problem of proof which confronted the Court in Texas Sling Co. v. Emanuel, 431 S.W.2d 538 (Tex. 1968). It should not be a satisfying result if, under the facts of the case, Gulf has taken no precautions to keep its crane from collapsing and then, when sued for the harm done, Gulf need only to answer that the plaintiff cannot pinpoint a moment when careful inspection routine would have discovered metal fatigue and averted the harm.

■ In the present case the plaintiff did not stop with allegations of particular acts of negligence but specifically and expressly pleaded the "doctrine of res ipsa loquitur" and alleged that the calamity was one which would not have occurred without the negligence of Gulf. If the physical circumstances of this accident lead reasonably to the belief that, in the absence of negligence, it would not have occurred, and if the instrumentality which caused the injury is shown to have been under the management and control of the alleged tortfeasor, the negligence of that alleged tortfeasor may be inferred from the mere fact that the accident happened under those physical circumstances. Bond v. Otis Elevator Company, 388 S.W.2d 681 (Tex. 1965); Clark-Daniel's, Inc. v. Deathe, 131 S.W.2d 1091 (Tex.Civ.App.1939, writ ref'd); McCray v. Galveston H. & S. A. Ry. Co., 89 Tex. 168, 34 S.W. 95 (1896). With or without help of the Latin words, the case at hand seems to be a typical one where the circumstances themselves present a fact issue of the defendant's negligence. Cranes weighing seven tons do not usually tear loose from their bases without someone being at fault. Since Gulf was in control of the bolts which collapsed, it is inferable that the failure would not have occurred without the negligence of Gulf. The jury was entitled to find that Gulf was probably negligent and that the negligence probably caused the collapse. On the other hand, the jury might not so find. Furthermore, Gulf could avoid liability by proving that the collapse of the crane was either due to a physical cause beyond its control or to some

failure that reasonable precautions on its part would not have prevented or discovered.

■ The Court of Civil Appeals ruled against plaintiff's res ipsa contention for the reason that since Hope Birmingham was operating the crane at the time of the collapse, he was in control rather than Gulf. We do not agree. The crane operator did not relieve the crane's owner of responsibility for safety of the bolts which held the crane upon its mount simply by his operation of the crane. The passenger in an elevator or the one at its controls does not become responsible for the mechanism of the elevator. Bond v. Otis Elevator Company, *supra*. When plaintiff takes possession and physical control of a Coca-Cola bottle which then bursts in his hands, application of the res ipsa rule of evidence is not precluded so long as the jury is entitled to find that the bottle was not mishandled or damaged after delivery to the plaintiff by the defendant. Pittsburg Coca-Cola Bottling Works v. Ponder, 443 S. W.2d 546 (Tex.1969); Honea v. Coca-Cola Bottling Co., 143 Tex. 272, 183 S.W.2d 968, 160 A.L.R. 1445 (1944). The control that is required for the application of the res ipsa rule is not necessarily control exercised at the time of the injury, but it may be control exercised at the time of the negligent act which subsequently leads to the injury. Peterson v. Minnesota Power and Light Company, 207 Minn. 387, 291 N.W. 705 (1940); Prosser, Torts, 219 et seq. (4th ed. 1971). Furthermore, a distinction should be made between control over the movement of the machine and responsibility for the particular instrumentality which caused the accident. Morris, Res Ipsa Loquitur in Texas, 26 Tex.L.Rev. 257, 263 (1948).

Petitioner Birdie Irene Birmingham's Motion for Rehearing is granted. Our former judgment is set aside and the opinion of June 26, 1974, is withdrawn. The cause of action asserted by Mrs. Birmingham against Gulf Oil Corporation is severed from her cause of action asserted against Head & Guild Equipment Company, Diamond M Drilling Company, Inc., Flournoy Drilling Company, and Koehring Company. The judgments of the trial court and the Court of Civil Appeals relating to the claim against Gulf Oil Corporation are reversed and said cause of action is remanded to the trial court for a new trial. The judgments in favor of the other defendants, as severed, are affirmed.

DENTON, J., dissents and filed opinion in which GREENHILL, C. J., and DANIEL, J., join.

DENTON, Justice (dissenting).

I respectfully dissent. In my opinion the majority opinion has not correctly applied the facts of this case as reflected by the record to the applicable law.

Hope Birmingham was injured on April 14, 1967, when a Lorain MC–425 crane fell from the drilling platform located in the Gulf of Mexico offshore from Mustang Island. He died from such injuries without regaining consciousness on April 16, 1967. The crane in question was manufactured by the Thew Shovel Company, the predecessor of Koehring Company, a defendant, and was sold in January 1956 to Brewster-Bartle Drilling Company, Inc., predecessor of Diamond M Drilling Company, Inc., by Head & Guild Equipment Company who was a distributor of Lorain Cranes. The latter two companies are also defendants. At the completion of some workover operations in 1956, Brewster-Bartle sold the crane to Gulf Oil Corporation. Gulf Oil was the owner of the drilling platform and crane which fell from the drilling platform when Birmingham was fatally injured.

In December 1966, Flournoy Drilling Company, another defendant, contracted with Gulf to workover two oil wells owned by Gulf which were located underneath Gulf's platform involved here. The workover operation began in December 1966 and continued until April 1967. The

operation had been completed, and the equipment belonging to Flournoy Drilling Company was being moved off of the platform at the time of the accident which resulted in the death of Birmingham. The crane was used to lift all of the equipment, personnel and supplies onto and off the platform except for light loads which were transported to the platform by helicopter which was operating under contract with Gulf. The crane had a rated lifting capacity of 25 tons and a 10 foot radius with a 30 foot boom. The crane sits upon a circular base called a bearing race ring gear, which rotates. It is bolted to the bearing race ring gear by 12 bolts 1⅛″ in diameter, eight of which were 4″ long and four were 4½″ in length.

Prior to the dismantling process the various pieces of equipment had been weighed by Flournoy personnel. Kalvin Gernandt, the tool pusher for Flournoy, had planned where each piece of equipment was to be placed on the boat. Gernandt was giving directions for the loading of the equipment on the boat by giving signals to Birmingham; he was telling him what to pick up and where to place it on the boat. Prior to the accident various pieces of equipment from the platform had been lifted onto the boat, including a superstructure in two pieces, one of which weighed 19,000 pounds and the other 20,000 pounds, and a draw works weighing 23,700 pounds. Later, a pump weighing 12,580 pounds was picked up and lowered to within four feet of the deck of the boat. It was being held in a stationary position while the boat was being moved up to a position so that the pump could be lowered into the boat and placed in the desired position on the boat. The pump was held in this position for a period estimated from eight to fifteen minutes while the boat was being moved so that the pump could be lowered to its intended position. Suddenly and without warning the bolts which held the crane to its base broke and stripped, and the crane toppled from its platform. The crane hit the deck of the boat and slid into the water. Birmingham was lodged under some equipment on the deck of the boat. He died some two days later as a result of the injuries he received from the accident.

The plaintiffs alleged that the defendants were negligent in: (1) that the defendants failed to make reasonable and proper inspections of the bolts which failed; (2) that the defendants failed to discover rusted and corroded bolts; (3) that the defendants failed to properly maintain the crane; (4) that the defendants were negligent in installing bolts with less strength than manufacturer's specifications; and (5) that plaintiff had a right to recover on the theory of res ipsa loquitur.

Since this is an instructed verdict case, the court must review the evidence in its most favorable light in support of the plaintiffs' position. Anderson v. Moore, 448 S.W.2d 105 (Tex.1969); Seideneck v. Cal Bayreuther Associates, 451 S.W.2d 752 (Tex.1970). A proper determination of these law questions must be based on an acceptance of the evidence and the inferences therefrom most favorable to the plaintiffs' case, discarding contrary evidence and inferences. White v. White, 141 Tex. 328, 172 S.W.2d 295 (1943); Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953).

In March 1956, while the crane was being operated by a tool pusher for Brewster-Bartle, the bolts in the base of the crane sheared off and the crane eased down on the load as it was in the process of lifting. Because the boom of the crane was over the platform at the time it fell the blowout preventor settled to the deck of the platform and the crane did not fall from its pedestal. It is undisputed that Gulf was notified of the breaking of the bolts at the base of the crane. New bolts were furnished by the Lorain Crane dealer, Head & Guild. The tool pusher installed the twelve new bolts in March 1956. He had no knowledge of the type of bolts, or their strength; nor of how much torque should be placed on the bolts in tightening them to the platform.

The first ground of negligence was that the defendants failed to make reasonable and proper inspection of the bolts which failed. Gulf Oil did not know whether the bolts installed in 1956 were ever taken out, moved or removed during the eleven-year period from the time of the installation until the time they broke. A Gulf supervisor admitted that they had not maintained any inspection or maintenance records concerning the crane or the specific bolts in question. It was also conceded that during the eleven-year period no tests were made by Gulf or on its behalf to determine the strength of the bolts; nor did Gulf have any information with respect to tests or inspections made by third parties. Mr. Ray Charitat, the production foreman for Gulf, testified that to the best of his knowledge the bolts had never been removed; that he had no specific knowledge of whether the bolts had ever been inspected between 1958 and 1967; that as a routine matter of maintenance the bolts of the crane were not removed and treated with rust inhibitor when the rest of the crane was so treated; and that he had never requested Head & Guild to treat the bolts or to examine them for rust or for any other condition.

By interrogatories, Head & Guild answered that its employees, agents and servants had not inspected the bolts which fastened the crane to the platform prior to the date of the accident on April 14, 1967. Kalvin Gernandt, the tool pusher for Flournoy Drilling Co., testified that to his knowledge no one with Flournoy Drilling had at any time prior to the accident ever checked the bolts by which the crane was mounted to the stand. This testimony was corroborated by the president of Flournoy.

After the crane collapsed from its mounting in April 1967, at the time of this accident, it was discovered that one of the bolts that secured the crane to its pedestal did not meet the manufacturer's specification. This bolt had coarse threads, that is, seven threads per inch rather than twelve threads per inch as specified by the manufacturer; and had a squarehead rather than the specified hexagonal head. The record is silent as to how or when this bolt was placed in the base of the crane. Mr. Thomas Manning testified it was not done by Brewster-Bartle in 1956, when the crane first fell. Although the record shows that a coarse thread bolt has a more reduced surface strength or clamping qualities than a fine thread bolt, the evidence is that this coarse thread bolt and nut did not strip. This bolt failed like the other bolts which failed by fatigue fracture. I am convinced that the evidence in this case did not raise an issue of causation relative to the bolt that did not meet the manufacturer's specification.

Plaintiffs called as an expert witness Mr. Richard Matthaei, a registered professional engineer and consulting metallurgist. Mr. Matthaei testified, after inspecting the bolts in question prior to the trial, that it was his opinion the bolts failed because of a fatigue type fracture. Although he was unable to define the term "fatigue", he did describe the mechanism by which the failure occurred. He stated that the term fatigue was not correctly described as "tired" metal. He described the term as one that was caused by cyclic loading or stressing of the metal—that is loading and unloading—that metal had an "endurance limit" which is 50% of its ultimate strength; and that fatigue occurs only after metal has been cyclically loaded beyond its endurance limit. He explained the fatigue's fracture as occurring in two stages—first a microscopic fracture or crack which progresses across the bolt reducing its diameter until the diameter is reduced to the point that the remaining vertical portion of the shank of the bolt is reduced in cross-sectional area to a point where it has insufficient strength to support a nominal load, whereupon it simply pulls apart with a straight tensile failure. He attributed fatigue fracture failure to cyclic stressing of loading and unloading and vibrational stressing. He testified that fatigue "can occur over night"; that the elapsed time between the

beginning and the end of such a failure might be a matter of minutes, if a slow fracture, or a fraction of a second in the case of a rapid failure. No other witness testified as to these matters.

Mr. Matthaei testified and repeatedly stressed the importance of maintenance and annual inspection of the equipment, including the bolts. He recommended a dye-penetrant testing of the bolts, and of replacement where such tests revealed cracks in the bolts. In regard to the suggested dye test, he testified: "Well, I would like to see it done that way. I don't think it's practical, but I would like to see it done that way." There is no evidence that this type of test was regularly applied. Neither is there any testimony that this test if performed would have revealed the very small cracks in the bolts.

The plaintiffs further alleged that the defendants were negligent in their failure to discover the rusted and corroded bolts, and that such negligence was the proximate cause of the death of Birmingham. While the record contains evidence that the crane in question was subjected to salt water atmospheric conditions which cause rust and corrosion, there is no evidence that the bolts were exposed to atmospheric conditions. Ray Charitat, production foreman for Gulf, testified that the bolts which were recovered at the time of the accident were not rusted or corroded. This was confirmed by photographer David Wheeler, who went to the scene and photographed all the bolts that were recovered and later photographed them again in his studio under lights. He testified that the bolts were very greasy at that time. The only evidence that any of the bolts were rusted or corroded came from the testimony of Mr. Matthaei who saw the bolts just prior to the trial. He testified that you could expect a change that would take place such as rusting of bolts that were left in the same position for a period of eleven years. The evidence showed that the bolts were recovered from the bottom of the Gulf of Mexico; others from the

crane which had been recovered from the Gulf; and remaining bolts were unaccounted for from the time of the accident until the trial. There was no testimony that any witness saw any of the broken or stripped bolts with rust on them at the time of the accident. There was no direct evidence that the bolts which secured the crane to its base were corroded or rusted at the time of the accident. Neither was there evidence that the bolts were not greased or that rust preventatives had not been applied to them. There was testimony that rust inhibitors and preventatives were periodically applied to the crane and its structure as a matter of routine maintenance; however, there was no testimony that the bolts in question were removed and treated. Conversely, there is no evidence that they were not so removed and treated or treated without removal. As indicated the bolts were not recovered at the time of the accident, but went to the bottom of the Gulf of Mexico with the crane and were submerged in the salt waters of the Gulf for some sixty days. When they were retrieved the crane and its component parts were then stored on property near Portland, Texas in a crane salvage where it remained for more than two years before being removed for inspection. There is no evidence of the condition of the bolts at or near the time of the accident.

Mr. Matthaei, who inspected the bolts prior to the trial testified concerning the rust and effect it has on metals, nuts and bolts. He did not attribute the failure of any of the bolts—broken or stripped—to rust or corrosion; nor did he implicate rust and corrosion as a mechanism responsible for the fatigue fracture. There is nothing in this record to indicate that the stripping of a nut from a bolt was caused by rust and corrosion, or that the thread damage or any unbroken bolt which had stripped was due to rust and corrosion.

Proximate cause embraces at least two distinct concepts, both of which must be present: (1) there must be cause in fact—a cause which produces an event

without which the event would not have occurred; (2) foreseeability. Baumler v. Hazelwood, 162 Tex. 361, 347 S.W.2d 560 (1961); Kaufman v. Miller, 414 S.W.2d 164 (Tex.1967).

In the present case the only cause in fact of the failure of the bolts was from fatigue. There is no evidence that the bolts which failed were suffering from fatigue at any particular time, that is, a year before the accident, one month before the accident, or one hour before the accident. Nor is there any evidence that an annual inspection would have revealed fatigue in the bolts.

In my opinion the doctrine of res ipsa loquitur is not applicable under the facts of this case.

The defendant Gulf owned the offshore platform and the crane in question. Under the terms of a written contract with the defendant Flournoy Drilling Company for the performance of a workover, Gulf supplied the crane. Flournoy in turn contracted with Roy Dugger for the services of a crane operator. Hope Birmingham, the deceased, was the operator furnished by Dugger. At the time of the accident in question, the workover had been completed and Flourney was in the process of unloading its rig and other equipment onto a boat for transporting to shore. It is undisputed that during the workover operation for a period of some 114 days, the duty of routine inspection and maintenance of the crane was that of the crane operator. The evidence is undisputed that the deceased performed these functions. He requested the purchase of parts which were needed and made repairs on the crane itself. During this time the decedent was also observed tightening the bolts in the base of the crane with a monkey wrench, and not a torque wrench, with a "cheater pipe" attached to the handle for additional leverage. Thus, the record affirmatively shows that the control of the crane and its repairs

and maintenance had been exercised by the decedent for more than sixteen weeks prior to the accident. The bolts which failed and caused the accident had been inspected and tightened by the decedent with a monkey wrench and cheater pipe. Under the circumstances, the doctrine of res ipsa loquitur is not applicable. Jones v. Nafco Oil & Gas, Inc., 380 S.W.2d 570 (Tex.1964); Wichita Falls Traction Co. v. Elliott, 125 Tex. 248, 81 S.W.2d 659; Owen v. Brown, 447 S.W.2d 883 (Tex.1969).

I would affirm the judgment of the courts below.

GREENHILL, C. J., and DANIEL, J., join in this dissent.

## ON SECOND MOTION FOR REHEARING

REAVLEY, Justice.

Gulf Oil Corporation points out that it sought by its pleadings indemnity and contribution against other defendants, and these claims should not be foreclosed by our judgment upon a record containing only the evidence produced by plaintiff in her case-in-chief. The motion for rehearing by Gulf is partially granted but otherwise overruled. The motion for rehearing by Flournoy Drilling Company in support of Gulf's motion is overruled. The judgment of November 13, 1974, is set aside. The judgments of the trial court and the Court of Civil Appeals are reversed and the cause is remanded to the trial court for further proceedings consistent with the opinion of this Court, including repleading by Gulf to designate parties against which it seeks recovery, elimination of any original defendant not retained by the impleader of a defendant, and for trial. Additional motions for rehearing may be filed by any party to complain of this judgment but not the prior holding of the Court.