Opinion issued June 14, 2016



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00335-CV

———————————

## CENTERPOINT HOUSTON ELECTRIC, LLC, Appellant

## V.

## 5433 WESTHEIMER, LP; 5433 WESTHEIMER, GP LLC AND SONGY 5433 WESTHEIMER GP LLC, Appellees

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-75635**

---

## MEMORANDUM OPINION

CenterPoint Houston Electric, LLC supplies electricity to a commercial building located at 5433 Westheimer. CenterPoint sued the owners and operators of the building after a connection between the city's water supply line and the building's internal plumbing separated and caused significant flooding that

destroyed CenterPoint's electrical equipment in the building's sub-basement. CenterPoint contended that the 5433 Westheimer defendants were negligent, relying, in part, on the res ipsa loquitur doctrine. Following a bench trial, the trial court entered a defense verdict, and CenterPoint recovered nothing on its claims.

CenterPoint raises three issues. First, it raises a factual sufficiency challenge to the trial court's judgment. It also argues that the trial court erred by considering evidence of a presale inspection and applying the wrong legal standard regarding a property owner's duty.

We affirm.

### Background

CenterPoint asserted a negligence claim against 5433 Westheimer, LP, AmREIT 5433 Westheimer GP, LLC, and Songy 5433 Westheimer GP, LLC. It alleged that the defendants' negligent inspection and maintenance of the connection between the city's water supply line and the building's internal plumbing system proximately caused the destruction of its equipment. Specifically, CenterPoint alleged that a proper inspection would have uncovered the need for a "thrust restraint" at the point where the piping separated and proper maintenance would have led to the installation of a thrust restraint to prevent pipe separation. CenterPoint also alleged that the defendants failed to properly monitor the

2

basement for water accumulation, which allowed what could have been a much smaller leak to become an 890,000 gallon flood.

CenterPoint relied on the res ipsa loquitur doctrine, arguing that the character of the accident was such that it could not have occurred without the defendants' negligence and that the plumbing system was under the defendants' sole management and control.

The flooding that damaged CenterPoint's equipment occurred on a holiday, New Year's Day 2011, while the on-site property manager was not on duty. She received a call from the answering service around 11:00 a.m. informing her that an elevator was malfunctioning. She arrived approximately two hours later. As she arrived, she received a call from the fire department informing her that a fire alarm had activated. After that, she heard two loud explosions and called the fire department to investigate. When the fire department arrived, the sub-basement was completely under water and the upper basement had between four and five feet of water in it.

The property manager hired Paul Davis Restoration to extract the water. It took six days to extract more than 890,000 gallons of water from the basement. CenterPoint's electrical equipment that powered the building was destroyed by the water damage and had to be removed and replaced.

The plumber who responded to the service call that day, Wayne Spivey, determined that the water breach was caused by a misalignment of a 6-inch mechanical joint coupling that connected the city's water supply to the building's plumbing. His investigation revealed that the pipes on either side of the coupling were no longer properly aligned. The connection did not twist open; instead, one pipe moved away from and out of alignment with the coupling that connected it to the other pipe. He saw no evidence that the coupling had worn or was otherwise damaged.

This was not the first significant building flood Spivey had dealt with that was caused by a mechanical failure; he had seen "multiple" failures over his 43-year plumbing career. Spivey testified that there was not a thrust restraint at the pipe connection point that became misaligned. A thrust restraint is a piece of angle iron, mounted to a wall, floor, or other relatively rigid structure, that holds piping in place and prevents it from rotating. He testified that he would have recommended using one at that location to help prevent pipe movement; however, he did not testify that it was negligent not to have included one. Regarding whether a thrust restraint would have prevented the pipe separation, i.e., causation, he testified: "Not necessarily," but "[i]t could" have.

The director of operations for AmREIT, a real estate investment trust that operated and managed the building, and the on-site building manager both testified

4

that they were unfamiliar with thrust restraints and were unaware that there was not a thrust restraint holding this plumbing connection in place.

CenterPoint called Richard Tonda, a mechanical engineer with a Ph.D. in mechanics and materials, to testify as an engineering expert. He was familiar with the type of coupling used in this pipe configuration. The coupling was designed to last the life of the pipe. Tonda asked to inspect the coupling but was told that it was no longer available. Tonda testified that, based on the information he could obtain, the cause of the pipe misalignment was "probably" water pressure fluctuation in the water system, which can cause "water hammer," meaning a repeated thrust of water hitting the building's pipes with enough force to move the pipes out of alignment.

When asked whether a thrust restraint would have prevented the pipe misalignment, Tonda responded:

> Well, such a thrust restraint would have inhibited the kind of motion that we saw in this failure and certainly could possibly have prevented that. Now, there's no perfect answer to anything, as Mr. Spivey indicated to you just earlier. . . . A properly designed thrust restraint would have prevented this kind of motion, yes. Would that have prevented this catastrophe completely, without knowing a few more of the details, I don't guess we will ever really know all of those things. . . . But it's pretty reasonable to conclude that had this kind of thrust restraint been provided, it certainly would have inhibited this motion. There's no doubt about that.

Tonda agreed that the pipe installer "should have" included a thrust restraint. Further, it would have been "a good practice," post-installation, to determine

5

whether a thrust restraint had been incorporated into the system and, if not, to add one. However, like Spivey, he did not testify that the failure to include a thrust restraint was negligent or breached any professional standards.

CenterPoint also called Timothy Hatch, a consulting engineer who performs failure analysis, to testify concerning the cause of the pipe-system failure. Hatch agreed with Tonda that the likely cause of the pipe movement was a fluctuation in water pressure coming into the building. This could have caused a "water hammer" effect. Also like Tonda, Hatch testified that his "water hammer" opinion was supported by reports that the city was working on the water pipes in the area and was turning the water on and off to do so. In his opinion, "there should have been some sort of a thrust restraint to keep the pipe from rotating the way it did." Such a restraint would have cost, by his estimate, $100 and would have prevented the pipe separation. While Hatch testified that it would have been prudent for the building owner to install a thrust restraint, he also agreed that he had no criticisms or complaints about the building owner as it related to the cause of the water leak.

## Factual Sufficiency

CenterPoint pleaded that the 5433 Westheimer defendants negligently inspected and maintained the plumbing system in the building. At trial, it argued that, through the defendants' negligence, the pipe system was left unstable, susceptible to water hammer from water pressure fluctuation, and ultimately gave

6

way to that pressure and ruptured at the coupling. CenterPoint contends that it provided sufficient evidence of the defendants' negligence to prevail and the trial court erred by disregarding the great weight of evidence in its favor when it awarded a defense verdict.

The 5433 Westheimer defendants respond that no expert criticized the defendants' management or maintenance of the property. Further, no expert testified that a thrust restraint would have prevented the flooding that occurred.

## A.    Standard of review

In reviewing a factual-sufficiency challenge, we consider and weigh all of the evidence and set aside a finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *McMahon v. Zimmerman*, 433 S.W.3d 680, 691 (Tex. App.—Houston [1st Dist.] 2014, no pet.). When a party attacks the factual sufficiency of an adverse finding on an issue on which it had the burden of proof at trial, it must demonstrate that the trial court's finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Grider v. Mike O'Brien, P.C.*, 260 S.W.3d 49, 57 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

In reviewing a trial court's conclusions of law, we use a de novo standard and will uphold the conclusions if the judgment can be sustained on any legal

theory supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *In re Moers*, 104 S.W.3d 609, 611 (Tex. App.—Houston [1st Dist.] 2003, no pet.). A trial court's conclusions of law may not be challenged for factual sufficiency; however, we may review the legal conclusions drawn from the facts to determine whether the conclusions are correct. *BMC Software*, 83 S.W.3d at 794; *Holloway–Houston, Inc. v. Gulf Coast Bank & Tr. Co.*, 224 S.W.3d 353, 357 (Tex. App.—Houston [1st Dist.] 2006, no pet.). If we determine that a conclusion of law is erroneous, but the trial court's judgment was nevertheless proper, the error does not require reversal. *BMC Software*, 83 S.W.3d at 794.

When the trial court acts as factfinder in a bench trial, it is the sole judge of the credibility of the witnesses. *See Murff v. Murff*, 615 S.W.2d 696, 700 (Tex. 1981); *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). It may choose to believe one witness over another, and a reviewing court may not impose its own opinion to the contrary. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). Because the factfinder has sole ability to resolve conflicting evidence, we must assume that it resolved all conflicts in harmony with its verdict. *Id.* at 820; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

**B.     The trial court's findings of fact and conclusions of law**

The trial court entered findings of fact and conclusions of law. These included that CenterPoint did not prove the elements of breach or causation. The trial court included in its conclusions of law a quote from *Western Textile Products Co. of Texas v. Sidran*, 262 S.W.2d 942, 943 (Tex. 1953):

> When a structure or appliance such as is in general use has uniformly answered the purposes for which it was designed and used under every condition supposed to be possible in the business, it cannot in reason be said that a person has not acted with ordinary prudence and sagacity in not anticipating an accident which afterwards happens in the use of the thing notwithstanding it continued substantially in the same condition all the time.

**C.     Whether rulings were clearly wrong and manifestly unjust**

We must be cognizant of the proper appellate standard for reviewing a factual-sufficiency challenge. We are not to decide whether we would have ruled similarly or even if the trial court's ruling was against the weight of the evidence, but, instead, whether it was so against the great weight and preponderance of the evidence that is was "clearly wrong and manifestly unjust." *Cain*, 709 S.W.2d at 176; *McMahon*, 433 S.W.3d at 691.

Several experts testified that they would have recommended a thrust restraint at this location. While they suggested that it would have been prudent to include one, none testified that it was negligent or breached a professional standard not to include the restraint. Nor did any witness testify that owners or property

9

managers customarily include thrust restrains or that any directives or guidelines to owners or property managers recommend thrust restrains. The closest to testifying in favor of CenterPoint on that issue was Hatch, but he also testified that he had no criticisms or complaints about the 5433 Westheimer defendants as it related to the cause of the flooding. Spivey—the plumber who attempted to repair this particular failure, as opposed to those hired to analyze the case post-failure—testified that he was not surprised to find that no thrust restraint was being used and that he commonly sees such configurations without thrust restraints in commercial buildings. The testimony from Hatch and Spivey indicated that it was not negligent to fail to install a thrust restraint at this location.

To the extent CenterPoint's claims were based on the 5433 Westheimer defendants' failure to retrofit the piping with a different coupling, Tonda's testimony indicated that the coupling used in this particular configuration was designed to last the life of the pipe. Further, there was no evidence that there had been any corrosion or leaking at the coupling before the failure occurred. No witness criticized the building management for failing to replace the coupling, just as no witness testified that the 5433 Westheimer defendants' failure to install a thrust restraint was negligent.

The evidence was even less compelling on the issue of causation. Spivey stated that use of a thrust restraint may not have restricted the pipe movement that

10

occurred. In other words, even if the 5433 Westheimer defendants noticed the absence of the thrust restraint and installed one, the accident still might have occurred. His testimony indicated a lack of a causal link between the absence of the thrust restraint and the coupling separation and flooding. CenterPoint's causation argument was also hampered by the testimony of its engineering expert, Tonda. He said that, while a thrust restraint would have limited the "kind of motion" that moved these pipes out of alignment, he could state only that it "possibly" would have prevented the failure.

The trial court, as factfinder, determines the credibility of the witnesses and the weight to give their testimony. *See City of Keller*, 168 S.W.3d at 819; *Murff*, 615 S.W.2d at 700; *HTS Servs., Inc.*, 190 S.W.3d at 111. To the extent the trial court found these witnesses' causation testimony credible, we will not second guess that determination.

We conclude that the trial court's finding that CenterPoint failed to establish the necessary elements of breach and causation is not so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust.

The res ipsa loquitur doctrine does not alter our conclusion. This doctrine permits a jury to infer negligence under certain, specific circumstances. *Birmingham v. Gulf Oil Corp.*, 516 S.W.2d 914, 917 (Tex. 1974). The doctrine is applicable only when (1) the character of the accident is such that it would not

11

ordinarily occur in the absence of negligence and (2) the instrumentality causing the injury is shown to have been under the defendant's management and control. *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex. 1989); *City of Houston v. Church*, 554 S.W.2d 242, 243 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.).

The party relying on the doctrine must "'so reduce' the likelihood of other causes that the [factfinder] can reasonably find by a preponderance of the evidence that the negligence, if any, lies at the defendant's door." *Turbines, Inc. v. Dardis*, 1 S.W.3d 726, 741 (Tex. App.—Amarillo 1999, pet. denied). "Where the evidence shows that an accident may have happened as a result of two or more causes, and it is not more reasonably probable that it was due to the negligence of the defendant than to any other cause, the rule of res ipsa loquitur does not apply." *City of Houston*, 554 S.W.2d at 243–44.

There was evidence that the pipes became misaligned due to fluctuations in the water pressure entering the building. All of the experts agreed with the premise that the fluctuation was caused by the city manipulating the flow of water in the area. Spivey testified that he has seen similar flooding many times during his career and that a thrust restraint would "not necessarily" have prevented the pipe movement or flooding that occurred. Based on this evidence, the trial court ruled that CenterPoint failed to establish that its damages were proximately caused by

12

the negligence of the 5433 Westheimer defendants. Implicit in that conclusion is that the pipe separation and flooding equally could have been the result of a non–negligent cause. Because CenterPoint's damages could have equally been caused by a non-negligent cause, the res ipsa loquitur doctrine does not apply. *See id.* (concluding that res ipsa loquitur doctrine did not apply in context of broken water pipe because break equally could have been caused by natural, unpredictable ground shifts as by party's negligence).

We overrule CenterPoint's first issue challenging the factual sufficiency of the evidence.

### Evidence of Inspection Report

In its second issue, CenterPoint argues that the trial court should have "excluded any mention of a presale inspection" of the building that allegedly occurred when the 5433 Westheimer defendants purchased the property in 2006. CenterPoint does not cite to any legal authority for its contention that the trial court committed error or that any such error, in a bench trial, would be harmful. *See* TEX. R. APP. P. 38.1(i) (requiring brief to contain argument with appropriate citations to authorities and record). Nor does it provide record citations to establish that it made an objection and obtained a ruling on that objection. *See* TEX. R. APP. P. 33.1(a)(1) (requiring complaining party to establish that it made its complaint known to trial court by timely request, objection, or motion and that trial court

either ruled on complaint or refused to rule). We overrule CenterPoint's second issue.

## Legal Standard Applied by Trial Court

In its final issue, CenterPoint argues that the trial court's citation to *Western Textile* in its findings of fact and conclusions of law indicates that the court used an incorrect legal standard. According to CenterPoint, the trial court erroneously relied on *Western Textile* to conclude that the 5433 Westheimer defendants did not have a duty to inspect the piping, which inspection, presumably, would have revealed the lack of a thrust restraint in the location that ruptured.

We have already overruled CenterPoint's factual-sufficiency challenge. It was within the court's province, as factfinder, to determine whether the evidence established a causal link between any negligent act of the 5433 Westheimer defendants and CenterPoint's damages. The trial court concluded that CenterPoint failed to establish this causal link. And the great weight and preponderance of the evidence was not so against the trial court's conclusion as to make that finding clearly wrong or manifestly unjust. Without adequate evidence to establish a causal link between the absence of a thrust restraint and CenterPoint's damages, the characterization of the 5433 Westheimer defendants' duty with regard to the absence of a thrust restraint is immaterial. Accordingly, we conclude that this issue is not necessary for the resolution of this appeal and do not reach it.

14

**Conclusion**

We affirm.

Harvey Brown
Justice

Panel consists of Justices Bland, Brown, and Lloyd.